1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE WESTERN DISTRICT OF OKLAHOMA

 3
    TROY D. GERMAN,                )
 4                                 )
         Plaintiff,                )
 5                                 )
    -vs-                           )    No. CIV-19-751-F
 6                                 )
    BILLY D. "RUSTY" RHOADES,      )
 7  individually;                  )
    MICHAEL HARRELL, individually; )
 8  BRIAN ORR, individually; and   )
    MEGAN SIMPSON, individually,   )
 9                                 )
         Defendants.               )
10

11

12

13                         * * * * *

14           DEPOSITION OF DAVID WAYNE PRATER

15           TAKEN ON BEHALF OF THE PLAINTIFF

16                IN OKLAHOMA CITY, OKLAHOMA

17                    ON JUNE 17, 2020

18                COMMENCING AT 1:56 P.M.

19                         * * * * *

20

21

22                   INSTASCRIPT, L.L.C.
                  101 PARK AVENUE, SUITE 910
23              OKLAHOMA CITY, OKLAHOMA  73102
                        405.605.6880
24                schedule@instascript.net

25  REPORTED BY:  BETH A. McGINLEY, CSR, RPR
```

EXHIBIT 2

1  blackmail, but he shows up on your doorstep and one of
2  your Assistant Attorney Generals presented it to the
3  grand jury and -- and -- and there's an indictment now
4  on -- on Troy German."
5           I said, "This is wrong." I said, "I don't
6  know what was presented, but -- but -- but this is
7  wrong. And I'm going to" -- I said, "I'm going to be a
8  witness for the defendant in this case and, you know, I
9  really do -- would like to talk to -- to Dane,
10 Mr. Towery, your Assistant Attorney General, about this
11 matter and" --
12      Q    So Dane Towery had not reached out to you, to
13 talk to you about your conversation with Rusty Rhoades?
14      A    No, because I don't know if he knew about it.
15      Q    Okay. All right. And so what did Attorney
16 General Hunter say?
17      A    Said absolutely, he'd talk to him.
18      Q    Okay. Did he have anything else to say during
19 this phone call?
20      A    No, not that I recall.
21      Q    Okay.
22      A    Not that I recall.
23      Q    So then you met with -- or you spoke to Dane
24 Towery. Was that in person or over the telephone?
25      A    I -- I -- and I don't remember -- excuse me --

```
 1   had a conversation with Gary James about it in the
 2   distant past.  I don't recall any specific conversation
 3   about -- about this case, with anyone.  Except counsel.
 4        Q    I'm going to turn your attention to Exhibit, I
 5   think, 3, the First Amended Complaint.
 6        A    Yes, sir.
 7        Q    If you'll turn to Page 17, Paragraph 107.
 8        A    Yes, sir.
 9        Q    And it says, "DA Prater stated that he
10   believed Rhoades was lying."
11             In that meeting, did you actually say that
12   you -- you believed Mr. Rhoades was lying?
13        A    I don't know if I used that terminology, but
14   that, in fact, was my impression of the information that
15   he was giving me and I -- I told him I didn't think that
16   he was being honest with me and wasn't telling me the
17   truth, that there was something more to this deal.
18        Q    Besides Mr. Harrell, Mr. Rhoades and -- and
19   Ms. Simpson and yourself, was there anyone else in that
20   meeting?
21        A    I believe my first assistant, Jimmy Harmon,
22   was there.
23        Q    Did anyone take notes --
24        A    No.
25        Q    -- during that meeting?
```

David Prater
6/17/2020

Page: 91

```
 1      A    I told them I felt like -- I felt the only
 2   thing I've heard that was unlawful was -- was what they
 3   did to provide at least one other trooper with an unfair
 4   advantage in the promotion process.  I don't know if I
 5   said, specifically, "criminal," but --
 6      Q    Okay.
 7      A    -- I told them it was unlaw- -- I felt like it
 8   was unlawful.
 9      Q    Do you know of any statute that would make
10   that unlawful?
11      A    No.  It just appalled me.  I was -- I was
12   extremely upset at what I had just heard.
13      Q    You thought it was unethical?
14      A    Incredibly unethical.
15      Q    But you not necessarily -- didn't -- didn't
16   know that it violated some -- some statute?
17      A    Criminal statute, no.
18      Q    Okay.  A civil statute?
19      A    I -- not -- not that I'm aware of, unless
20   there was some tortious interference.
21      Q    Prior to this December 11, 2018, meeting, had
22   these allegations, regarding Mr. German and -- and
23   Mr. Rhoades, been brought to your attention in any other
24   way?
25      A    No, sir.
```

David Prater
6/17/2020
Page: 96

1  really, it wasn't very nice.
2      Q    Okay.  Now, subsequent to the December 11
3  meeting, have you reviewed any evidence of -- that
4  supported the charges that were eventually filed against
5  Mr. German?
6      A    I don't recall seeing anything.
7      Q    Have you seen the investigation that was
8  completed by Troop Z?
9      A    No, sir.
10     Q    Have you seen any of the transcripts from the
11 grand jury proceeding?
12     A    No, sir.
13     Q    Okay.  Have you -- have you been provided or
14 seen a -- the interview that -- that was taken of
15 Mr. German?
16     A    Regard- --
17     Q    In the investigation.
18     A    No, sir.
19     Q    Okay.  And you don't know if Mr. German made
20 any -- any sort of admissions or confessions in that --
21 in that interview, that would support the -- the
22 criminal charges?
23     A    No, sir.
24     Q    Okay.  Now, I believe you discussed before
25 that -- that you were -- that Mr. Rhoades never came

(405) 605-6880 instaScript