## UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1) TROY D. GERMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. CIV-19-751-F** |
| | ) | |
| **(1) BILLY D. "RUSTY" RHOADES,** | ) | |
| **Individually;** | ) | |
| **(2) MICHAEL HARRELL, individually** | ) | |
| **(3) BRIAN ORR, individually, and,** | ) | |
| **(4) MEGAN SIMPSON, individually.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANT BRIAN ORR'S MOTION FOR SUMMARY JUDGMENT
## AND MEMORANDUM OF LAW IN SUPPORT

Respectfully Submitted,

S. Alex Yaffe, OBA No. 21063
Andrew M. Casey, OBA No. 32371
Foshee & Yaffe
12231 S. May Ave.
Oklahoma City, OK 73170
Phone: (405) 378-3033
**ATTORNEYS FOR BRIAN ORR**

# TABLE OF CONTENTS

*Page*

*DEFENDANT BRIAN ORR'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT* ................................................................. 1

**I.      INTRODUCTION** ............................................................................ 1

**II.     STATEMENT OF UNDISPUTED MATERIAL FACTS** .......................... 3

**III.    ARGUMENTS AND AUTHORITIES** ...................................... 15

    **A.** *Supreme Court Precedent Mandates Dismissal of Captain Brian Orr. Defendant Orr Holds Absolute Immunity For His Grand Jury Testimony Even If Proven To Be False.* .......................................... 15

    **B.** *Plaintiff's First Amendment Claims and Malicious Prosecution Claims Require "Absence of Probable Cause." No Evidence Exists To Support the Absence of Probable Cause; thus, these Claims Fail As a Matter Of Law and Must Be Dismissed.* ................................. 17

    **C.** *The Malicious Prosecution Claims Fail Because A Vital Prima Facie Element─Favorable Termination Of Proceedings─Is Non-Existent* ......................................................................................... 21

    **D.** *Qualified Immunity Protects Defendant Orr's Testimony Because It was Reasonably Believable That Probable Cause Existed for the Crime of Blackmail.* .......................................................................... 24

    **E.** *Plaintiff's Abuse Of Process Claim Fails as a Matter of Law.* ................. 25

    **F.** *Plaintiff's Conspiracy Claim Fails as a Matter of Law.* ............................ 27

    **G.** *Lastly, the Existence of the Grand Jury Indictment Combined With Four Separate Magistrates Allowing Search Warrants Based on Probable Cause Operates As an Intervening Factor Disrupting Any Hope Of Recovery Due To Qualified Immunity.* ............................................. 27

**IV.     CONCLUSION** ............................................................................ 29

**TABLE OF EXHIBITS**

*Page(s)*

EXHIBIT 1 – LT. RON SHATSAR INTERVIEW SUMMARY
EXHIBIT 2 – LT. RON SHATSAR STATEMENT TO TROOP Z
EXHIBIT 3 – DISCIPLINE REPORT #1
EXHIBIT 4 – DISCIPLINE REPORT #2
EXHIBIT 5 – DEPOSITION OF RHOADES
EXHIBIT 6 – DEPOSITION OF KEATING
EXHIBIT 7 – TRANSCRIPT OF AUDIO RECORDING OF ORR/GERMAN
EXHIBIT 8 – TROOP A TEST QUESTIONS
EXHIBIT 9 – HARRELL INTERVIEW SUMMARY 1
EXHIBIT 10 – HARRELL INTEVIEW SUMMARY 2
EXHIBIT 11 – HARRELL STATEMENT
EXHIBIT 12 – HOLT INTERVIEW TRANSCRIPT
EXHIBIT 13 – FRANCIS INTERVIEW TRANSCRIPT
EXHIBIT 14 – ORR STATEMENTS/SUMMARIES
EXHIBIT 15 – MAPLES INTERVIEW
EXHIBIT 16 – INDICTMENT
EXHIBIT 17 – INFORMATION
EXHIBIT 18 – THE OKLAHOMAN ARTICLE
EXHIBIT 19 – FAIRRES SEARCH WARRANT
EXHIBIT 20 – RAINES SEARCH WARRANT
EXHIBIT 21 – HOLT SEARCH WARRANT #1
EXHIBIT 22 – HOLT SEARCH WARRANT #2
EXHIBIT 23 – FRANCIS SEARCH WARRANT
EXHIBIT 24 – PRATER DEPOSITION

**TABLE OF AUTHORITIES**

*Page(s)*

**UNITED STATES SUPREME COURT CASES:**

*Rehberg v. Paulk*,
    *566 U.S. 356* ............................................................................................. 1, 15-17
*Hartman v. Moore*,
    547 U.S. 250, 126 S. Ct. 1695, 1707, 164 L. Ed. 2d 441 (2006) ...................... 13
*Nieves v. Bartlett*,
    139 S. Ct. 1715, 1725, 204 L. Ed. 2d 1 (2019) ................................................. 13

**10TH CIRCUIT AND 10TH CIRCUIT DISTRICT COURT CASES:**

*Bass v. Richards,*
  308 F.3d 1081, 1089 (10th Cir.2002) ................................................................. 7
*Brammer-Hoelter v. Twin Peaks Charter Acad.,*
  492 F.3d 1192 (10th Cir. 2007) ..............................................................7-8, 15
*Bryson v. City of Edmond,*
  905 F.2d 1386 (10th Cir.1990) ........................................................... 14
*Cordova v. City of Albuquerque,*
  816 F.3d 645 (10th Cir. 2016) ........................................................... 18
*D'Addabbo v. United States,*
  316 F. App'x 722, 723 (10th Cir. 2008)........................................................ 20
*DeSantis v. Napolitano,*
  716 F.Supp.2d 1100 (D.N.M.2010) ........................................................... 6
*Dodds v. Richardson,*
  614 F.3d 1185 (10th Cir.2010) ........................................................8-9
*Erikson v. Pawnee Cnty. Bd. of Cnty. Com'rs,*
  263 F.3d 1151 (10th Cir. 2001) ........................................................... 16
*Glapion v. Castro,*
  No. CIV 1401699 MEH, 79 F.Supp.3d 1207, 2015 WL 507006, (D.Colo.
  Feb. 4, 2015) ........................................................................................ 6
*Grubbs v. Bailes,*
  445 F.3d 1275, 1277 (10th Cir. 2006) ........................................................... 21
*Hall v. Bellmon,*
  935 F.2d 1106 (10th Cir.1991) ........................................................... 13
*Hitch Enterprises, Inc. v. Cimarex Energy Co.,*
  859 F. Supp. 2d 1249, 1268 (W.D. Okla. 2012).............................................. 22
*Hom v. Squire,*
  81 F.3d 969, 974 (10th Cir.1996) ........................................................... 7
*Jennings v. City of Stillwater,*
  383 F.3d 1199, 1200 (10th Cir. 2004) ........................................................... 9
*Lighton v. Univ. of Utah,*
  209 F.3d 1213, 1224 (10th Cir.2000) ........................................................... 7
*Lancaster v. Indep. Sch. Dist. No. 5,*
  149 F.3d 1228, (10th Cir.1998) ........................................................... 7
*Lockheed Martin Corp. v. Admin. Review Bd., U.S. Dept. of Labor,*
  717 F.3d 1121, 1132 (10th Cir.2013) ........................................................... 6
*McBride v. Peak Wellness Ctr., Inc.,*
  688 F.3d 698, 704 (10th Cir.2012) ........................................................... 5
*McEvoy v. Shoemaker,*
  882 F.2d 463, 466 (10th Cir.1989) ........................................................... 8

*M.G. v. Young*,
    826 F.3d 1259 (10th Cir. 2016) ........................................................ 19
*Mocek v. City of Albuquerque*,
    813 F.3d 912 (10th Cir. 2015) .......................................................... 14
*Morris v. Noe*,
    672 F.3d 1185, 1196 (10th Cir. 2012) ....................................... 14, 17
*Myers v. Koopman*,
    738 F.3d 1190 (10th Cir. 2013) ........................................................ 18
*Pahls v. Thomas*,
    718 F.3d 1210 (10th Cir.2013) .....................................................8-10
*Taylor v. Meacham*,
    82 F.3d 1556, (10th Cir.1996) ......................................................... 13
*Thomas v. Kaven*,
    65 F.3d 1183, 1194 (10th Cir.2014) ............................................... 14
*Wilkins v. DeReyes*,
    528 F.3d 790 (10th Cir. 2008) ......................................................... 19

## OTHER FEDERAL CIRCUIT CASES:

*Bowie v. Maddox*,
    653 F.3d 45 (D.C.Cir.) ...................................................................... 16
*Davis v. McKinney*,
    518 F.3d 304 (5th Cir.2008) ............................................................. 16
*Hand v. Gary*,
    838 F.2d 1420 (5th Cir. 1988) ......................................................... 20
*Salge v. Edna Indep. Sch. Dist.*,
    411 F.3d 178 (5th Cir.2005) ............................................................... 8
*Townes v. City of New York*,
    176 F.3d 138, 141 (2d Cir. 1999) ................................................... 20
*Williams v. Dallas Indep. Sch. Dist.*,
    480 F.3d 689 (5th Cir.2007) ............................................................ 15

## STATE OF OKLAHOMA CASES:

*Brock v. Thompson*,
    948 P.2d 279 (Okla.1997) ................................................................ 22
*Ford v. Justice Alma Wilson Seeworth Academy*,
    2010 WL 545872, (W.D. Okla. Feb. 9, 2010) .................................... 3
*Hall v. GEO Group, Inc.*,
    324 P.3d 399, 403 (Okla. 2014) ........................................................ 3
*Hathaway v. State ex rel. Med. Research & Tech. Auth.*,
    2002 OK 53, 49 P.3d 740 .................................................................. 4
*Parker v. City of Midwest City*,

850 P.2d 1065, 1067 (Okla.1993) .................................................... 13

*Peterson v. Underwood,*
220 P.3d 1158 (Okla. Civ. App. 2008) ...................................... 18

*Schovanec v. Archdiocese of Oklahoma City,*
188 P.3d 158 (Okla.2008) ......................................................... 22

*Wright v. KIPP Reach Academy Charter School*,
2011 WL 1752248, (W.D. Okla. May 6, 2011) ...................................... 3

*Zachary v. State ex rel. Dep't of Corr.,*
2001 OK CIV APP 120, 34 P.3d 1171 ............................................. 3

**STATE STATUTES:**

Okla. Stat. tit. 51, § 153. ........................................................... 3
Okla. Stat. tit. 51, § 156. ........................................................... 3
Okla. Stat. tit. 51, § 157. ........................................................... 3

**FEDERAL STATUTES:**

Fed. R. Civ. P. 56. ............................................................ 1
42 U.S.C. §1983.     1

## DEFENDANT BRIAN ORR'S MOTION FOR SUMMARY JUDGMENT
## <u>AND MEMORANDUM OF LAW IN SUPPORT</u>

Pursuant to Fed. R. Civ. P. 56, Defendant Orr submits this Motion for Summary Judgment against the First Amended Complaint (Doc. No. 3) and memorandum of law in support. The evidence available does not show disputed material facts that allow this Plaintiff to proceed to trial.

## I.  INTRODUCTION

In a *unanimous* 9-0 decision of the United Supreme Court which held that a witness in a grand jury proceeding is entitled to the *same absolute immunity* from suit under § 1983 as a witness who testifies at trial, Justice Samuel Alito reasoned that:

> "allowing civil suits for false grand jury testimony," the court reasoned, "would ... emasculate the confidential nature of grand jury testimony, and eviscerate the traditional absolute immunity for witness testimony in judicial proceedings." ... [Defendant] was entitled to absolute immunity, not only with respect to claims based directly on his grand jury testimony, but also with respect to the claim that he conspired to present such testimony… To allow liability to be predicated on the alleged conspiracy, the court concluded, " 'would be to permit through the back door what is prohibited through the front.'"

*Rehberg v. Paulk*, 566 U.S. 356, 360–61, 132 S. Ct. 1497, 1501, 182 L. Ed. 2d 593 (2012) (internal citations omitted).

Here, the Court must fashion an answer to one simple question: whether this Plaintiff can sue a grand jury witness for testimony provided against that Plaintiff in a confidential grand jury setting? *Assuming arguendo* that this Court generally answers that question in the affirmative, then the court must answer

specifically whether that same grand jury witness can be ordered to stand trial against retaliation, malicious prosecution, and abuse of process claims raised by a criminal defendant who surreptitiously recorded that witness, used said recording to blackmail his boss, and later confessed to the crime of blackmail causing independent third party investigators to seek an indictment from a multi-county grand jury against that criminal defendant?

In this lawsuit, Defendant Orr moves this Court to answer all of these questions in the negative. The law does not allow this Plaintiff to sue Defendant Orr for his grand jury testimony. In addition, even if it did, the remaining precedents require Plaintiff to meet an extremely high burden of showing a fabrication of evidence by this Defendant in order to justify a false blackmail charge being brought against this Plaintiff. Such evidence does not exist.

The undisputed evidence shows that, on December 17, 2018, this Plaintiff, post-Miranda warning, confessed to the crime of blackmail in a series of interviews by three irreproachable and decorated highway patrol troopers. Specifically, Plaintiff confessed that he had three meetings with Defendant Billy D. "Rusty" Rhoades ("Rhoades"), the Commissioner of the Department of Public Safety. During these meetings, German confessed that he informed Rhoades of an alleged cheating scandal involving Defendant Brian Orr ("Orr") being given test questions for a promotion board oral interview by Defendant Michael Harrell ("Harrell"). German confessed that he provided Rhoades a list of demands at these meetings to "effect change." The demands included (a) disciplining Harrell for the

alleged cheating; (b) making changes to the Department's promotional policies; (c) requiring the Department to add an assessment center for promotions; (d) adding additional majors in the Department; and (e) vacating the promotion given to Orr.

German confessed that he provided Rhoades a written timeline with deadlines for when these changes were required to be made. German confessed that he provided Rhoades a list of politicians and members of the media and told Rhoades that the listed individuals would be informed of the cheating if his demands were not met. German's confession meets the broad definition of blackmail found in 21 O.S. 2011 § 1488. As a result, based on German's confession alone, there was probable cause to accuse, indict and arrest German for the crime of blackmail. In accordance with the decision to seek an indictment, a subpoena was issued requiring Defendant Orr to appear before the multi-county grand jury and testify. Accordingly, all of Plaintiff's claims in this matter fail as a matter of law with respect to Defendant Captain Brian Orr.

## II. STATEMENT OF UNDISPUTED MATERIAL FACTS

1.     Plaintiff began a targeted campaign searching for any useful information to leverage against Defendants Rhoades and Harrell no later than May of 2018 when he and Jack McCoy conspired to use their authority to interrogate an innocent Trooper, Lieutenant Ron Shatsar, upon a baseless rumor that Shatsar had "cheated" on an oral interview for promotional boards to the position of

Lieutenant. (Exhibit 1 – Lt. Shatsar Troop Z interview summary, Exhibit 2 – Lt. Shatsar statement).

2.      Despite Plaintiff's façade as an "agent of change," the undisputed evidence shows that Plaintiff participated in creating a culture of cheating on oral interviews by providing information he now claims is "unethical" and violative of the rules of the highway patrol to at least two highway patrol troopers, including Defendant Orr. (Exhibit 3 – Disciplinary Report of Trooper Brian Orr, Exhibit 4 – Disciplinary report of a separate Trooper, both submitted under seal).

3.      Plaintiff's reputation for manipulation and dishonesty precedes him. Said reputation affected the impression of the relevant actors whose motives now stand in question for reporting allegations about him. (Exhibit 5, deposition of Rusty Rhodes, pgs. 58-59, 92-93, 94-95, 98-99, and 106).

4.      According to items produced by Plaintiff, on July 17, 2018, Plaintiff met with Defendant Orr and surreptitiously recorded his conversation with Orr. (Exhibit 7, transcript of recording of Brian Orr/Troy German Meeting). Said recording, ironically, violates patrol policy. (Ex. 5 – P. 73). The contents of the conversation indicate that Defendant Orr conversed with Defendant Harrell, then Chief of the Patrol, regarding areas of study test questions for an upcoming promotional interview that correspond to actual subjects of test questions for an upcoming promotional interview. (Exhibit 8, test questions).

5.      The evidence offered by Plaintiff fails to show that Defendant Orr was provided with direct answers to any test question. (Ex. 7.).

6.     On August 21, 2018, prior to his first meeting with Defendant Rhoades, Plaintiff attended a meeting with Chief of the Patrol, Defendant Harrell who reprimanded and dressed plaintiff down for being a part of leaking sensitive information. (Exhibit 9, Harrell interview summary, Exhibit 10 – Harrell Interview summary supplement, Exhibit 11, Harrell Statement). Plaintiff's reprimand for lying by Harrell became motivation for his blackmail attempt. (Ex. 5 – Rhoades Depo., pgs. 66-67, 69-70, and 124-125).

7.     During that meeting, Plaintiff became visibly upset with the accusations that he was a liar. (Id.)

8.     On the same day as that meeting, Plaintiff German met with Rhoades for the first of what would become three meetings in August and September 2018 regarding the subject matter leading to the criminal investigation in this case. The first meeting was at Mr. Rhoades's office. The second meeting was at Charleston's in Oklahoma City. The third meeting was at Starbucks in Midwest City. (Exhibit 12 - Holt Interview Transcript, Ex. 2, p. 8, l. 10 – p. 9, l. 7; and p. 18, l. 8 – 23; and First Amended Complaint, dkt. 3, ¶¶ 51, 68 and 71).

9.     During the three meetings, Plaintiff informed Defendant Rhoades of an alleged cheating scandal whereby Defendant Harrell provided Defendant Orr the questions and answers for an upcoming promotion board oral interview. (Exhibit 12 - Holt Interview Transcript, Ex. 2, p. 8, l. 10 –p. 10, l. 1; and First Amended Complaint, dkt. 3, ¶¶ 51, 68 and 71).

10.     During the three meetings with Defendant Rhoades, Plaintiff demanded that Defendant Rhoades "effect change." At the Charleston's and Starbucks' meetings, Plaintiff specifically demanded that Defendant Rhoades: (a) discipline Harrell for the alleged cheating; (b) make changes to the Department's promotional policies; (c) require the Department to add an assessment center for promotions; and (d) add additional majors in the Department. German likewise gave Rhoades written deadlines to complete German's demands. (Exhibit 12 – *supra,* UF 8-9).

11.     German was interviewed by Trooper Jason Holt and Trooper Jim Parish on December 17, 2018. Oklahoma Department of Public Safety, Oklahoma Highway Patrol, Supplement Form, Captain Troy German Interview, p. 1, a copy attached hereto as Exhibit "13."

12.     At the beginning of the December 17, 2018 interview, German was informed of the purpose of the interview and was advised of his Miranda warning. Transcript of Audio Recording of an Interview with Troy German Titled "801_0168 German Z" Transcribed on June 22, 2020 ("Holt Interview Transcript"), p. 2, l. 11 – p. 4, l. 18, a copy of the relevant pages of the Holt Interview Transcript is attached hereto as Exhibit "12."

13.     During these interviews, Plaintiff made numerous post-miranda statements effectively confessing to the crime of blackmail. First, Plaintiff confessed to making a series of demands upon Defendant Rhoades as shown below:

Page 26
20 Q. Okay. Have you ever made any demands to the
21 commissioner at all relating to any of that?
22 A. To benefit me?
23 Q. To benefit you.
24 A. No.
25 Q. To benefit anybody else?

Page 27
1 A. No. The patrol as a whole, yes. Change the
2 promotional process, assessment center, to have the
3 chief step down.
...
14 Q. Okay. Did you -- did you ever give any
15 pieces of paper or any demands at all regarding
16 promoting you to major?
17 A. No. All I said was that the majors had to
18 be -- they were on this deal. I told him, I said,
19 "These things have got to happen. These are the
20 deadlines have got to happen," and that's when I slid
21 the piece of paper that had all the people that I was
22 going to contact on it, and I point blank told him
23 that he's going to have to make sure that the ones
24 that promoted -- that he's going to have to make --
25 the command staff was going to have to be a

Page 28
1 legitimate command staff, and he needed to promote
2 majors to command staff.
3 Q. Okay. You said "demands." What -- what do
4 you mean by demand? Time frames? Tell me -- tell me
5 what you meant when you said slid across demands,
6 time lines. What -- what's -- what's that?
7 A. That -- well, before the -- before the
8 governor took over. In other words, I will -- if he
9 takes care of this and changes this that I would go
10 on down the road, and it doesn't get aired out.
11 Q. And so -- okay. So tell me -- okay. So you
12 say before the governor got elected. Before Stitt --
13 or at that point I guess you didn't know.
14 A. It was either Edmondson or Stitt. That's
15 correct.
16 Q. So the time line revolved around the

17 election.
18 A. That's correct.
19 Q. Okay. Revolved around the election. And
20 what -- so other than the names, what else -- what
21 else had revolved -- what else had to happen before
22 governors changed?
23 A. Promotional process changed. Legitimate
24 promotions, the legitimate promotions to major.
25 Legitimate promotions to lieutenant colonels.

Page 29
1 Legitimate promotions all the way around. Captains,
2 lieutenants, whatever.
...
19 MR. PARISH: So would your request or your
20 requirement or your demand or what you wanted to see
21 different, would it have been to eliminate the majors
22 that are there and --
23 MR. GERMAN: No.
24 MR. PARISH: -- replace them? Just add to.
25 MR. GERMAN: Add to. They're going to be –

Page 30
1 there's going to be attrition.
2 MR. PARISH: Okay. All right.
3 Q. (By Mr. Holt) You know, so was it by -- I
4 mean, were they just random dates? Was it the
5 election date? What...
6 A. I -- I think I gave him dates because of the
7 election. It was all hinged around the election.
8 Maybe even the -- yeah, I guarantee you it would
9 all -- it would all have hinged around the election.
10 Q. Okay.
11 A. Because that would have made the difference
12 to me on when I was going to go and who I was going
13 to go to.

Page 46
4 Q. Okay. And then just -- just to make sure,
5 just to kind of reiterate this "effect change
6 business" that you -- that you're referring to -- and
7 I don't -- I don't disagree with one bit -- how would
8 you know -- if you could explain it to me, how would

8

9 you know as -- I don't know. For lack of a better
10 term -- an agent of change that that change had been
11 actually effected?
12 A. I'd see it in policies, promotional
13 policies, being changed --
14 Q. Okay.
15 A. -- towards an assessment center. The chief
16 being disciplined or held accountable for his
17 actions.
18 Q. So you would just -- you could sit back and
19 watch and see if things were --
20 A. That is correct.
21 Q. Right. And know that -- that they were
22 things that you in fact had --
23 A. And -- and hence the deadlines.
24 Q. Right.
25 A. I could see them happening.

Page 47
7 Q. Let me ask you this: Did you -- did you
8 have suggestions for the commissioner as far as...
9 A. I mentioned about not being top five, that
10 when he came in, he went from top three to top five
11 to top ten. Talked about why go to ten? Why leave
12 it open for more people? Assessment center. I
13 mentioned the assessment center.
14 Q. What do you mean by that?
15 A. The assessment center?
16 Q. Uh-huh.
17 A. Okay. There are agencies -- well, it's a
18 national deal. State agencies, fire, law
19 enforcement, all kinds of agencies, that have what's
20 called an assessment center. It's an outside entity.
21 For instance, we have people that go out of state and
22 sit on these boards in these assessment --
23 Q. Right.
24 A. -- centers. Same thing.
25 Q. So it's not an internal?

Page 48
1 A. Less internal.
2 Q. Okay. So -- so you'd have outsiders
3 actually picking a lot of those -- at least a portion

9

4 of your --
5 A. Right. Like, the top three -- I think the
6 rule is the rule of three with the top three
7 (inaudible) commissioner, and they would pick from
8 the top three.
9 Q. Okay. Promotional process changes.
10 A. Yes.
11 Q. Assessment center. Promotions. Actual
12 command (inaudible) promotions. Promotions to major
13 occurred. And discipline the chief. Deal with the
14 chief.
15 A. Deal with it.
16 Q. (Inaudible.)
17 A. Yeah. Whatever it is.

Holt Interview Transcript, Ex. 12, p. 26, l. 20 – p. 27, l. 3; p. 27, l. 14 – p. 29, l. 2;

p. 29, l. 19 – p. 30, l. 13; p. 46, l. 4 – 25; and p. 47, l. 7 – 48, l. 17.

14.     To further confirm that German made demands on Rhoades, Parish

asked German the following:

Page 34
11 MR. PARISH: And -- and when you say "effect
12 change" -- sorry to interrupt, but something's come
13 to my mind--that's a broad term for the things that
14 you had detailed that you wanted to see. Command
15 staff changes, chief step down, were that -- all
16 those things included in -- in your change?
17 MR. GERMAN: Yes.

Holt Interview Transcript, Ex. 12, p. 34, l. 11 – 17.

15.     A follow up interview of German was conducted at approximately

5:35 p.m. on December 17, 2018 by Francis. After again being advised of his

Miranda warning, German further confirmed that he had provided Rhoades a

written list of demands and timeline on a letter during one of his meetings with

Rhoades. German also confessed during this exchange to demanding the

promotion of Orr be vacated. These statements are confirmed in the following

exchanges:

> Page 3
> 23 Q. So my understanding would be you're not
> 24 going to tell me what was on the letter or...
> 25 A. I've already talked to Holt about what all
> Page 4
> 1 the things were on the letter, things to do and all
> 2 that, but go ahead with the next one.
> 3 Q. Well, that -- that's -- he's the one that
> 4 actually is -- is -- wasn't sure about the time line
> 5 that you had on the letter. What -- what exactly --
> 6 was there a time line there as far as what was
> 7 asked --
> 8 A. That --
> 9 Q. -- to be done or...
> 10 A. -- that I wanted -- yeah. That I wanted to
> 11 see change happening. Not necessarily what to be
> 12 done, just the change happening. Removing the chief
> 13 -- or not -- not even removing the chief. Just
> 14 dealing with the chief, doing what's right, and the
> 15 chief -- vacating the promotion.
> Page 7
> 19 Q. Going back to the letter, can -- can you try
> 20 to think what was on the letter as far as -- I mean,
> 21 was there a list of things that you were wanting --
> 22 A. I was wanting the promotional process
> 23 changed and trying to effect change that way, trying
> 24 to do what's right on that, trying to get things
> 25 right.
>
> Page 9
> 19 Q. Okay. So you wanted a change in the
> 20 promotional process. Was that specifically written
> 21 on that note or --
> 22 A. I'm sure it was. Now, this is a long time
> 23 ago, now.

Transcript of Audio Recording of Interview With Troy German Titled

"181217_1830 Cpt

G Chandler" (the "Francis Interview Transcript"), p. 2, l. 13 – 21; p. 3, l. 23 – p. 4,

l. 15; p. 7, l. 19 – 25; and p. 9, l. 19 – 23, Exhibit "13."

16.     In his meetings with Rhoades, German provided Rhoades a list of

people that he was going to contact if his demands were not met. These included

members of the media, Oklahoma Senate and Oklahoma House of

Representatives. German confirmed this in the following exchanges:

> Page 14
> 18 Q. You said you haven't -- you said that you
> 19 had the list of people you were going to tell. Who
> 20 all was on that?
> 21 A. OSBI because of state statute. Command
> 22 staff. I believe I still have the list. I can give
> 23 it to you. Senate. The House. Media. I believe I
> 24 even had something in there: anybody that I could
> 25 get to effect change.
> Page 15
> 1 Q. Okay. So kind of a (inaudible)?
> 2 A. That's -- (inaudible). I had a list of who
> 3 I was going to contact, trying my best to get him to
> 4 do what's right.

Holt Interview Transcript, Ex. 2, p. 14, l. 18 – p. 15, l. 4.

17.     In his interview with Holt and Parish, German repeatedly confessed

that he made clear to Rhoades that he was going to release information regarding

the cheating scandal involving Orr and Harrell to members of the media,

Oklahoma Senate and Oklahoma House of Representatives if his above demands

were not met. This is confirmed in the following exchanges:

> Page 9
> 19 ... He met with me again up at
> 20 Charleston's up on the Kilpatrick one on one, at
> 21 which time I told him about the chief's lying again,

22 told him he's not effected change, that I heard that
23 he was to change the promotional process to -- to go
24 from five to ten, that this was not the change I was
25 talking about, that he had to effect change or I was
Page 10
1 going to take matters further.
Page 30
14 Q. And so if he didn't have those things
15 changed or at least --
16 A. Effect positive change was always what I
17 said. Effect positive change.
18 Q. -- by then, then you said you were going to
19 go --
20 A. Further up. Whatever --
21 Q. Further up.
22 A. -- it needed to take. Senate, House, media,
23 whatever it took.
24 MR. PARISH: You told me that, Senate,
25 House, media. So he was -- he knew where you were

Page 31
1 talking about.
2 MR. GERMAN: Oh, yes. He saw it, yes. Sure
3 did. Saw the piece of paper I gave him. Yes.
4 Absolutely.

Page 34
2 Q. Okay. So -- so don't let me misquote you.
3 So -- but part of the demands were if you didn't see
4 some of those things that you had said were problems
5 prior to a certain date, whatever date's on the note,
6 then you were going to turn that information over to
7 the list of OSBI, the Senate, media --
8 A. Yes.

Holt Interview Transcript, Ex. 2, p. 9, l. 19 – p. 10, l. 1; p. 30, l. 14 – p. 31, l. 4;

and p. 34, l. 2 – l. 8.

18.     No defendant sought a grand jury investigation. The investigation and decision to  initiate a grand jury lies with the Attorney General's office: an un-named party. (Ex. 5 – Rhoades depo, pgs 109-111).

19.     Defendant Orr, under subpoena, testified at the grand jury consistent with the statements he made to the troop Z investigators and surreptitious recordings made by Plaintiff. (Exhibit 14 – Statements of Defendant Orr and interview summaries of Defendant Orr).

20.     The Seventeenth Multicounty Grand Jury issued an Indictment for one count of blackmail, 21 O.S. § 1488, against German. The Indictment was filed in the District Court of Oklahoma County, State of Oklahoma, on February 15, 2019. (Exhibit 16 – Indictment).

21.     On March 6, 2019, an Information for one count of blackmail against German was filed by Mike Hunter, Oklahoma Attorney General, by and through K. Dane Towery, Assistant Attorney General. Information, a copy attached hereto as Exhibit "17."

22.     The prosecution was terminated in exchange for Plaintiff's retirement from the Highway patrol. (Ex. 5 – Rhoades deposition, pgs. 112-113; Ex. 6 – Keating deposition, pg. 62; Ex. 18 – article from the Oklahoman quoting Attorney General announcement). Said dismissal was not because the prosecution believed Plaintiff to be innocent. (Ex. 6 – Keating deposition – pgs 64-65).

23.     David Prater has not seen the results of the investigation regarding German completed by Troop Z, including the interviews of German conducted by

14

Holt, Parish and Francis on December 17, 2018. Transcript of the Deposition of David Wayne Prater. on June 17, 2020, p. 96, l. 7 – 23, (Exhibit "24".)

24.    Plaintiff's alleged damages were the result of search warrants independently obtained by parties not named in this suit like Capt. Jason Holt. Ex. 19 – Fairres Search Warrant,  SW-18-111; Ex. 20 – Raines Search Warrant, SW-18-110; Ex. 21 – Holt Search Warrant, SW-2018-1438; Ex. 22 -Search Warrant, SW-2018-1457; Ex. 23 – Francis Search Warrant, SW-2018-12-17-01; Ex. 6 – Depo of Rhoades, P. 91-92, and 120 (Search warrants were obtained by Holt separately and apart from Rhoades due to a firewall from the investigation).

25.    The Troop Z investigation independently operated and was firewalled away from Defendant Rhoades, Orr, and Harrell. (Ex. 5 – Rhoades Depo., Pgs. 91-92). Plaintiff's only listed "expert" witness, David Prater, supported having Troop Z investigate this matter. (Ex. 24 – Prater depo. P. 49-50).

## I.   ARGUMENT AND AUTHORITIES

### *A.* **Supreme Court Precedent Mandates Dismissal of Captain Brian Orr.** *Defendant Orr Holds Absolute Immunity For His Grand Jury Testimony Even If Proven To Be False*.

Immunity for grand jury witnesses is a longstanding immunity grounded in history and reason which was not eliminated by the passage of 42 U.S.C. § 1983. *Rehberg v. Paulk*, 566 U.S. 356, 361, 132 S. Ct. 1497, 1502, 182 L. Ed. 2d 593 (2012). Grand jury witness immunity shares similar histories with other common law immunities such as judicial immunity and legislative immunity. *Id.*

At common law, trial witnesses enjoyed a limited form of absolute immunity for statements made in the course of a judicial proceeding: They had complete immunity against slander and libel claims, even if it was alleged that the statements in question were maliciously false. *Kalina*, at 133, 118 S.Ct. 502 (SCALIA, J., concurring) (citing F. Hilliard, Law of Torts 319 (1866)); *see Briscoe*, 460 U.S., at 351, 103 S.Ct. 1108 (Marshall, J., dissenting); *Burns*, 500 U.S., at 501, 111 S.Ct. 1934 (opinion of SCALIA, J.). *; Rehberg*, 566 U.S. 366–67, (2012).

In *Briscoe,* the Supreme Court of the United States held that the immunity of a trial witness sued under § 1983 is broader than the limited common law immunity: In such a case, a trial witness has absolute immunity with respect to *any* claim based on the witness' testimony. When a witness is sued because of his testimony, the Court wrote, " 'the claims of the individual must yield to the dictates of public policy.' " 460 U.S., at 332–333, 103 S.Ct. 1108 (quoting *Calkins v. Sumner,* 13 Wis. 193, 197 (1860)). Without absolute immunity for witnesses, the Court concluded, the truth-seeking process at trial would be impaired. Witnesses "might be reluctant to come forward to testify," and even if a witness took the stand, the witness "might be inclined to shade his testimony in favor of the potential plaintiff" for "fear of subsequent liability." 460 U.S., at 333, 103 S.Ct. 1108.

The factors that justify absolute immunity for trial witnesses apply with equal force to grand jury witnesses. In both contexts, a witness' fear of retaliatory

litigation may deprive the tribunal of critical evidence. And in neither context is the deterrent of potential civil liability needed to prevent perjurious testimony. In *Briscoe,* the Court concluded that the possibility of civil liability was not needed to deter false testimony at trial because other sanctions—chiefly prosecution for perjury—provided a sufficient deterrent. *Id.*, at 342, 103 S.Ct. 1108. Since perjury before a grand jury, like perjury at trial, is a serious criminal offense, see, *e.g.,* 18 U.S.C. § 1623(a), there is no reason to think that this deterrent is any less effective in preventing false grand jury testimony. *Rehberg*, 566 U.S. at 367.

Here, the only thing that could conceivably justify a suit against Defendant Orr revolves around his grand jury testimony. Defendant Orr cannot be sued for allegedly cheating on a test. Defendant Orr cannot be sued for denying that he allegedly cheated on a test. Plaintiff's entire lawsuit—as applied to Defendant Orr—requires claims based on Defendant Orr's appearance and testimony to the grand jury. (Dkt. No. 3, Paragraphs 157, 166 and 167).

**B. Plaintiff's First Amendment Claims and Malicious Prosecution Claims Require "Absence of Probable Cause." No Evidence Exists To Support the Absence of Probable Cause; thus, these Claims Fail As a Matter Of Law and Must Be Dismissed.**

The Supreme Court requires Plaintiff to plead and prove an "absence of probable cause" for the prosecution against Plaintiff. *Hartman v. Moore*, 547 U.S. 250, 265–66, 126 S. Ct. 1695, 1707, 164 L. Ed. 2d 441 (2006). The Supreme Court's adoption of this "no-probable-cause" rule governs both the First Amendment claims and the Malicious Prosecution claims. In *Nieves v. Bartlett*,

139 S. Ct. 1715, the Supreme Court described that "[a]bsent such a showing, a retaliatory arrest claim fails. But if the plaintiff establishes the absence of probable cause … [then] … the plaintiff must show that the retaliation was a substantial or motivating factor behind the [arrest]…" *Nieves v. Bartlett*, 139 S. Ct. 1715, 1725, 204 L. Ed. 2d 1 (2019) (citing *Lozman*, 585 U.S., at ——, 138 S.Ct., at 1952–1953 (internal citations omitted).

The Tenth Circuit in *Breidenbach v. Bolish*, 126 F.3d 1288, 1293 (10th Cir. 1997) states that "[p]robable cause need not be based on actual guilt. Rather, probable cause to obtain a search warrant is based on a showing of a reasonable degree of suspicion that the suspected items will be found—not an actual showing that such items will be found." (emphasis added). Adumbrating the purpose, contours and spirit of probable cause, *Illinois v. Gates*, 462 U.S. 213, 231-32, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) states:

> Perhaps the central teaching of our decisions bearing on the probable cause standard is that it is a 'practical, nontechnical conception.'... 'In dealing with probable cause, ... as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'... Our observation in United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), regarding "particularized suspicion," is also applicable to the probable cause standard: The process does not deal with hard certainties, but with probabilities. …. As these comments illustrate, probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules. (emphasis added)(some internal citations omitted).

Moreover, "where there are no disputed questions of historical fact such as on summary judgment, the court makes the determination of… probable cause… on its own as a question of law." *Donahue v. Wihongi*, 948 F.3d 1177, 1187 (10th Cir. 2020) (internal citations omitted); *see also Miller v. Bourne*, 1953 OK 122, 208 Okla. 362, 363, 256 P.2d 431, 433 ("If there is no controversy over the facts, or if the facts are conceded, then it becomes a pure question of law for the court to determine whether there was probable cause or not.").

In this case, the undisputed evidence establishes probable cause for the arrest and indictment of German for the crime of blackmail. Oklahoma criminal statute defines the crime of blackmail as follows:

> Blackmail is verbally or by written or printed communication and with intent to extort or gain any thing of value from another or to compel another to do an act against his or her will:
> 1. Accusing or threatening to accuse any person of a crime or conduct which would tend to degrade and disgrace the person accused;
> 2. Exposing or threatening to expose any fact, report or information concerning any person which would in any way subject such person to the ridicule or contempt of society; or
> 3. Threatening to report a person as being illegally present in the United States, and is coupled with the threat that such accusation or exposure will be communicated to a third person or persons unless the person threatened or some other person pays or delivers to the accuser or some other person some thing of value or does some act against his or her will. Blackmail is a felony punishable by imprisonment in the State Penitentiary for not to exceed five (5) years or fine no to exceed Ten Thousand Dollars ($10,000.00) or by both such imprisonment and fine.

21 O.S. 2011 § 1488.

Here, German's own recorded confessions to Holt, Parish and Francis on December 17, 2018 establish the crime of blackmail. First, German confessed that

19

he attempted to compel Rhoades to take actions against Rhoades's will. German sought to compel Rhoades to discipline Harrell for the alleged cheating. German also sought to compel Rhoades to make changes to the Department's promotional policies, require the Department to add an assessment center for promotions, add additional majors in the Department and vacate the promotion of Orr. Id.

Second, German confessed that he sought to compel Rhoades to act against his will by: (1) accusing or threatening to accuse Orr and Harrell of a crime or conduct, the alleged cheating scandal, that would tend to degrade and disgrace the person accused and (2) exposing or threatening to expose the alleged cheating scandal concerning Orr and Harrell, which would subject Orr and Harrell to the ridicule or contempt of society. Specifically, German threatened to disclose the alleged cheating by Orr and Harrell to a list of elected officials and media members if German's demands were not met by German's written deadlines. Id. The alleged cheating by Orr and Harrell would certainly "degrade or disgrace the person accused" and subject them "to the ridicule or contempt of society." Moreover, Rhoades was the Commissioner of the Department of Public Safety. First Amended Complaint, dkt. 3, ¶ 2. The disclosure of the alleged cheating in Rhoades's department under his watch would likewise expose Rhoades to degradation, disgrace, ridicule or contempt in society. Therefore, German confessed to all of the elements of the crime of blackmail in his recorded interviews with Holt, Parish and Francis on December 17, 2018. Consequently, based on German's own confession, a person of prudence and caution would

20

believe that the offense of blackmail has been committed. Accordingly, probable cause existed for the Seventeenth Multicounty Grand Jury and Oklahoma Attorney General's office to accuse, indict and issue an arrest warrant for German, and German's claims for retaliatory prosecution in violation of the First Amendment and malicious prosecution in violation of the Fourth Amendment fail as a matter of law.

**C. The Malicious Prosecution Claims Fail Because A Vital Prima Facie Element─Favorable Termination Of Proceedings─Is Non-Existent.**

A §1983 malicious prosecution claim requires the plaintiff to show that:

(1) the defendant caused the plaintiff's confinement or prosecution;
(2) the original action terminated in the plaintiff's favor;
(3) there was no probable cause to confine or prosecute the plaintiff;
(4) malice; and
(5) damages.

*Cordova v. City of Albuquerque*, 816 F.3d 645, 650 (10th Cir. 2016) (citing *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008)). A "claim of malicious prosecution does not accrue until the criminal proceedings have terminated in plaintiff's favor." *Myers v. Koopman,* 738 F.3d 1190, 1194 (10th Cir. 2013).

In this circuit, voluntary dismissal of a prosecution by the government does not support a favorable termination on the merits. *Cordova*, 816 F.3d at 653. As the Tenth Circuit has explained, "the mere fact that a prosecutor had chosen to abandon a case was insufficient to show favorable termination . . . [i]nstead, the termination must in some way 'indicate the innocence of the accused.'" *Id.* at 651

(citations omitted). The indicative of innocence rule is well embedded in §1983 jurisprudence. *Id.* at 653 n. 2 (collecting cases).

Thus, a plaintiff "generally cannot maintain a malicious prosecution action unless his charges were dismissed in a manner indicative of innocence, even when he was entitled to dismissal on statutory or constitutional grounds. … it is both a standard feature of the tort of malicious prosecution and a reflection of the idea that malicious prosecution actions are disfavored at common law." *Cordova v. City of Albuquerque*, 816 F.3d 645, 653–54 (10th Cir. 2016) (*citing Hernon v. Revere Copper & Brass, Inc.,* 494 F.2d 705, 707 (8th Cir.1974) ("[T]he general rule is that suits for malicious prosecution are viewed with disfavor and are to be carefully guarded against.").

Under the precedents established by *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008), the second element of this test requires the plaintiff must show more than just the withdrawal or vacating of criminal charges—the plaintiff must demonstrate that the criminal proceedings were dismissed for reasons indicative of innocence, and not because of an ***agreement of compromise***, an extension of clemency, or technical grounds having little or no relation to the accused's guilt. *Id.* at 802–04 (emphasis added); *M.G. v. Young*, 826 F.3d 1259, 1262 (10th Cir. 2016).

As applied here, the abandonment of prosecution for Plaintiff's blackmail and extortion crime is not "indicative of innocence." The undisputed facts show

that dismissal was an agreed compromise in favor of Plaintiff's retirement. SOUF #22.

### D. Qualified Immunity Protects Defendant Orr's Testimony Because It was Reasonably Believable That Probable Cause Existed for the Crime of Blackmail.

Individual state actors are entitled to qualified immunity "under §1983 and *Bivens* unless a plaintiff demonstrates '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" *Mocek*, 813 F.3d at 922 (citations omitted). To be "clearly established," there must be either "a Supreme Court or Tenth Circuit decision on point, or the . . . established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012).

Even if, arguendo, the Court entertains some doubt as to the presence of probable cause, there was certainly arguable probable cause, the standard for qualified immunity. *Cortez v. McCauley*, 478 F.3d 1108, 1121 (10th Cir. 2007) states, "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." (emphasis added).

Plaintiff has the burden on this qualified immunity issue. It has long been the law that once a defendant asserts a qualified immunity defense in a dispositive motion, the responsibility shifts to plaintiff to "meet a 'heavy two-part burden.'" *Case v. West Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323 (10th Cir. 2007). "[T]o avoid judgment for the defendant based on qualified immunity, the plaintiff must

show that the defendant's actions violated a specific statutory or constitutional right, and that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct at issue." *Toevs v. Reid*, 646 F. 3d 752, 755 (10th Cir. 2011) *Wilson v. Falk*, 877 F.3d 1204, 1209 (10th Cir. 2017) states: 'If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden...—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.' (emphasis added) (*quoting Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008)).

### E. Plaintiff's Abuse Of Process Claim Fails as a Matter of Law.

In its Order of December 9, 2019 denying a motion to dismiss by all the defendants in this case, the Court indicated that "plaintiff identifies authorities indicating that an abuse of process claim can potentially be brought under the Fourth Amendment based on allegations that defendants brought a prosecution without probable cause." Order, dkt. 13, p. 11. As a result, it appears that German concedes that he must show lack of probable cause in order to proceed with his abuse of process of claim under Fourth Amendment. As established above, there was probable cause to accuse, indict and arrest German for the crime blackmail because German actually confessed to the crime. SOUF Nos. x-x.

Regardless, "state law provides the elements for a claim of abuse of process under §1983". *Erikson v. Pawnee Cty. Bd. of Cty. Comm'rs*, 263 F.3d 1151, 1155, n.5 (10th Cir. 2001). "Under Oklahoma law, an abuse of process claim requires a

24

showing of three elements: (1) issuance of process; (2) an ulterior purpose; and (3) a willful act in the use of process not proper in the regular conduct of the proceeding." *Meyers v. Ideal Basic Indus., Inc.*, 940 F.2d 1379, 1382 (10th Cir. 1991). Additionally, "[it] is generally accepted… that the gist of an action for 'abuse of process' is the improper use or perversion of process after it has been issued." *Gore v. Taylor*, 1990 OK CIV APP 24, 792 P.2d 432, 436 (emphasis added). German is unable to meet the common law elements of an abuse of process claim.

First, there is no evidence that the Defendant Orr issued any process related to German. SOUF Nos. x-x. The indictment against German was issued by the Seventeenth Multicounty Grand Jury. SOUF No. X. The subsequent information was filed by the Oklahoma Attorney General's office. SOUF No. X. As a result, Defendant Orr did not issue any "process" as it relates to German. Further, merely encouraging a governmental entity to bring a claim against another party <u>or</u> participating as a subpoenaed witness is not the issuance of "process." For example, in *Sturgeon v. Retherford Publications, Inc*., 1999 OK CIV APP 78, 987 P.2d 1218, a plaintiff aggrieved by a newspaper editorial filed an abuse of process claim against the newspaper and others because they encouraged the City of Broken Arrow to file a lawsuit against the plaintiff. Id. at ¶¶ 4 – 9. In affirming the judgment dismissing the abuse of process claim, the Oklahoma Court of Civil Appeals pointed out that the party filing the underlying lawsuit and issuing process, the City of Broken Arrow, had not been named in the abuse of process

lawsuit. Id. at ¶ 33. The Oklahoma Court of Civil Appeals found no authority supporting an abuse of process claim for merely encouraging another to initiate legal process. Id.

Similarly, here, the parties that actually issued process against German, the members of the Seventeenth Multicounty Grand Jury and the Oklahoma Attorney General's office, have not been sued for abuse of process. SOUF Nos. x-x. Therefore, there is no evidence that the Defendant Orr issued process as it relates to German.

Second, even if reporting a crime and encouraging prosecution were an initiation of process, German has failed to show "a willful act in the use of process not proper in the regular conduct of the proceeding." To satisfy this element, "the plaintiff must show some definite act or threat by the defendant not authorized by the process." Meyers, 940 F.2d at 1382. "Thus, merely showing the defendant carried out the process to its authorized conclusion, even though with bad intentions, is insufficient to establish an abuse of process claim." Id. Here, German actually confessed to the crime of blackmail. SOUF Nos. x-x. As a result, regardless of the Defendant Orr's intentions, Orr reporting German's confessed crime is an authorized conclusion to discovering the crime.

Finally, even if German could show the other elements of an abuse of process claim, German cannot establish any damages. German confessed to blackmailing Rhoades. Id. Therefore, German's damages were the result of German confessing to a crime, not the act of Orr participating at the grand jury.

26

Accordingly, German's claim for abuse of process in violation of the Fourth Amendment fails as a matter of law.

**F. Plaintiff's Conspiracy Claim Fails as a Matter of Law.**

"[T]o recover under a § 1983 conspiracy theory, a plaintiff must plead and prove not only a conspiracy, but also an actual deprivation of rights; pleading and proof of one without the other will be insufficient. This is because the essence of a § 1983 claim is the deprivation of the right rather than the conspiracy." *Dixon v. City of Lawton, Okl*., 898 F.2d 1443, 1449 (10th Cir. 1990) (internal citations to authority omitted).

Here, as shown above, there is no evidence of an actual deprivation of constitutional or any other rights because German confessed to the crime of blackmail. Accordingly, German's claim for conspiracy in violation of 42 U.S.C. § 1983 fails as a matter of law.

**G. Lastly, the Existence of the Grand Jury Indictment Combined With Four Separate Magistrates Allowing Search Warrants Based on Probable Cause Operates As an Intervening Factor Disrupting Any Hope Of Recovery Due To Qualified Immunity.**

This case features a situation where, *prior to* a grand jury indictment, four separate highway patrol troopers—acting independently from these defendants— sought search warrants based on the probable cause gleaned from their investigation. In those affidavits for search warrants, it was cited that whether the cheating was "true or false", there existed probable cause of blackmail due to the demands raised by Plaintiff against Defendant Rhoades followed by the threat of

exposing the cheating to the media. On four different occasions an independent magistrate found probable cause for a search warrant that was executed by those non-defendant affiants. (SOUF #23).

Under precedent, a grand jury's independent decision to indict based on all available evidence insulates law enforcement officers in later civil rights malicious prosecution suits. *See Hand v. Gary*, 838 F.2d 1420, 1427-28 (5th Cir. 1988) (grand jury's independent determination breaks causation); *see also Townes v. City of New York,* 176 F.3d 138, 145-6 (2d Cir. 1999). "The return of an indictment by a grand jury is a conclusive determination of the issue of probable cause." *D'Addabbo v. United States*, 316 F. App'x 722, 723 (10th Cir. 2008). For comparison, even an unconstitutional search is not enough. "The evil of an unreasonable search or seizure is that it invades privacy, not that it uncovers crime, which is no evil at all." *Townes*, 176 F.3d at 148; *see also Grubbs*, 445 F.3d at 1278 ("[I]f hypothetically correcting the misrepresentation or omission would not alter the determination of probable cause, the misconduct was not of constitutional significance and is not actionable under §1983 . . . .").

Here, a grand jury had independent evidence to return an indictment—the testimony of numerous grand jury witnesses and evidence from lawful searches and seizures that Plaintiff has not alleged were fabricated. (Doc. No. 3, ¶¶126-131). That grand jury's independent decision to return an indictment defeats causation. Despite prosecution's decision to later abandon the case, the chain of causation on any alleged unlawful arrest, criminal process and conviction "is

broken by the intervening exercise of independent judgment." 176 F.3d at 145-146. As such, the malicious prosecution claims should be dismissed.

In *Garcia v. Escalante*, 678 F. App'x 649, 655 (10th Cir. 2017)(unpub), the Tenth Circuit explains: "As a practical matter, we implement this [clearly-established-law] standard by asking whether there was 'arguable probable cause' for an arrest—if there was, a defendant is entitled to qualified immunity.' In other words, in the § 1983 qualified-immunity context, an officer may be mistaken about whether he possesses actual probable cause … so long as the officer's mistake is reasonable—viz., so long as he possesses 'arguable probable cause.'" (emphasis added)(citing, inter alia, A.M. v. Holmes, 830 F.3d 1123, 1139 (10th Cir. 2016)).

## *I.*  CONCLUSION

Dismissal is plainly warranted. Defendant Orr's only minimal participation in this case is not receiving a promotion to an exam he is alleged to have cheated on and then being required by subpoena to testify regarding what occurred.

**WHEREFORE,** the undersigned respectfully requests this action be dismissed.

Respectfully submitted,

/s/Andrew M. Casey
S. Alex Yaffe, OBA No. 21063
Andrew M. Casey, OBA No. 32371
Foshee & Yaffe
12231 S. May Ave.
Oklahoma City, OK 73170
Phone: (405) 378-3033

**CERTIFICATE OF SERVICE FORM FOR ELECTRONIC FILINGS**

   I hereby certify that on  November 2, 2020 , I electronically filed the foregoing document with the United States District Court for the Western District of Oklahoma by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system:

Stanley M. Ward, OBA#9351
Woodrow K. Glass, OBA#15690
Barrett T. Bowers, OBA#30493
For the Firm: Ward & Glass, LLP
1601 36th Ave. NW, Ste. 100
Norman, Oklahoma 73072
(405) 360-9700
(405) 360-7902 (fax)
Attorneys for Plaintiff

Garry Gaskins
Gentner Drummond

       /s/ Andrew M. Casey
       Andrew M. Casey, Attorney for Defendants

31