# TROY GERMAN, PLAINTIFF, V. BRIAN ORR, DEFENDANT

# WDOK 19-CV-751-F

# MOTION EXHIBITS FOR DEFENDANT ORR'S MOTION FOR SUMMARY JUDGMENT

# EXHIBIT 12 – HOLT INTERVIEW TRANSCRIPT OF GERMAN

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA


| | |
|---|---|
| TROY D. GERMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| -vs- | ) Case No. CIV-19-751-F |
| | ) |
| | ) |
| BILLY D. "RUSTY" RHOADES, | ) |
| individually; MICHAEL | ) |
| HARRELL, individually; | ) |
| BRIAN ORR, individually; | ) |
| and MEGAN SIMPSON, | ) |
| Individually, | ) |
| | ) |
| Defendants. | ) |




TRANSCRIPT OF AUDIO RECORDING OF

AN INTERVIEW WITH TROY GERMAN

TITLED "801_0168 GERMAN Z"

TRANSCRIBED ON JUNE 22, 2020




TRANSCRIBED BY KATE SCIPIONE, CSR, RPR

EXHIBIT

2

Page 2

1   (Beginning of audio file titled "801_0168 German Z.")

2              * * * * * * *

3       MR. HOLT:  Okay.  Okay.  Okay.  Perfect.

4  Thank you.  Bye.  Be right there.  (Inaudible.)  Hey,

5  Jim.

6          (Several voices speaking.)

7       MR. HOLT:  We'll come see what he's got.

8  BY MR. HOLT:

9     Q.  Hey, Captain.

10    A.  Hey, guys.  How are we doing.

11    Q.  Good.  So my understanding is that the

12  department's been made aware that -- of some

13  administrative leave stuff.  So let me tell you --

14  let me tell you what's going on.  So first off,

15  there's some rumors going around the department, tons

16  of rumors (inaudible) most of them with the change in

17  administration always comes rumors.

18       Some of those rumors are that -- that there

19  could be, oh, some criminal intent in some of those.

20  Made it all the way back to David Prater.  Okay?  So

21  David's made contact with some people within the

22  department asking Troop Z to -- to look into those.

23    A.  Okay.

24    Q.  Okay?  And so we are just trying to find

25  out -- because your name has popped up.  We're just

Page 3

1    trying to find out what you know about those.  Okay?

2    Before we get into that, I'm sure -- I mean, I've

3    been around you long enough -- nobody knows policy

4    probably as well as you do -- that we've got to give

5    you your rights --

6         A.  Understood.

7         Q.  -- because it's -- you know, it's part of an

8    investigation, and I'm sure you'll understand them,

9    but I've got to read them to you anyway just because

10   we have to with anybody we bring in here.  Okay?

11        A.  Yeah.

12        Q.  So --

13        A.  You said suspension with pay or without --

14   what did you say?

15        Q.  I think -- well, my understanding is it's

16   going to be -- and I don't know.  I haven't seen it

17   because that's not my -- my purview, but I think it's

18   suspension with pay.

19        A.  Okay.

20        Q.  Yeah.

21        A.  And with Troop Z -- I know you're reading me

22   my rights --

23        Q.  Yeah.

24        A.  -- this is criminal intent.

25        Q.  Well, this is investigation trying to figure

Page 4

1    out what you've got going on.  So, I mean, this --

2    it's your decision whether or not you want to talk.

3         A.   Understood.

4         Q.   Okay?  You do have the right to remain

5    silent.  Anything you say can and will be used

6    against you in a court of law.  You have the right to

7    talk to a lawyer and have him present with you while

8    you're being questioned.  If you cannot afford to

9    hire a lawyer, one can be appointed and will be

10   appointed to represent you before any questioning if

11   you wish one.  If you do decide to make any

12   statements, you may stop at anytime.

13         Do you understand each of those rights as

14   they -- as they have been explained?

15        A.   Yes.

16        Q.   Okay.  With -- with those rights in mind, do

17   you wish to speak to us?

18        A.   For now.

19        Q.   Okay.  So tons of rumors.  Again, I've heard

20   rumors that -- you know, that the current

21   administration was staying and I've heard the rumors

22   that, you know, everything from different

23   commissioners -- I've heard that you're going to be

24   assistant commissioner.  I heard that you were going

25   to be chief and pretty much everything, like,

Page 8

1    truck, but his Tahoe -- went out and got in the truck

2    and the commissioner says, "If one more person in the

3    legislature tells me to promote you," and then he

4    said that -- at that point, he said that the Troop A

5    -- he said he told him he's being promoted to Troop

6    R, and he said that Troop A is down to Lieutenant

7    John -- Joe Lane and Joe Williams, and who did he

8    want promoted.  Who -- who did he think needed to be

9    promoted.

10          Now, I waited until -- I have the dates.

11   They're on my time sheets, but I met with the

12   commissioner of public safety, Rusty Rhoades, three

13   times --

14        Q.  Okay.

15        A.  -- trying to get him to do what's right in

16   the way I deem what's right.  Told him about the

17   malfeasance with the chief for the patrol, the

18   cheating, and I actually did not want tied up in it,

19   and I even waited till the orders came out.

20        Q.  Orders of?

21        A.  Of Brian Orr being promoted.

22        Q.  Do you know what date that was?  How long

23   has Brian been promoted?

24        A.  September 1.

25        Q.  September 1?

Page 9

1     A.  And please don't quote me on that, but I

2  believe it was September 1.

3     Q.  Okay.  I think you're right.

4     A.  Once the orders came out on a Thursday or a

5  Friday, I met with the commissioner on a Monday or

6  Tuesday the following week.  Again, I have all this

7  on my time sheets, but...

8     Q.  Okay.

9     A.  At which time I met with the commission -- I

10  told the commissioner about the cheating, that it

11  went on.  The commissioner asked me what did I want.

12  I told him, I said, "Don't judge me by yourself.  I

13  don't want anything."

14     Q.  Okay.

15     A.  At which time I told him that we were going

16  to effect change and that we needed to effect change.

17  I waited until I had another meeting with him.  I

18  have texts on my phone where I told him I wanted to

19  meet with him again.  He met with me again up at

20  Charleston's up on the Kilpatrick one on one, at

21  which time I told him about the chief's lying again,

22  told him he's not effected change, that I heard that

23  he was to change the promotional process to -- to go

24  from five to ten, that this was not the change I was

25  talking about, that he had to effect change or I was

Page 10

1      going to take matters further.

2              Again, no change was made.  There used to be

3      someone that worked in professional standards that's

4      married to -- his wife is very wealthy.

5          Q.  Oh, you're talking about takes all the

6      pictures.

7          A.  Tim.  The reason I bring him up, he saw me

8      there at Charleston's with the commissioner.

9          Q.  Yeah.  No.  He was a lieutenant when he

10     left.

11         A.  Yes.

12         Q.  Took all the pictures.

13         A.  Yes.

14         Q.  Okay.  I know who you're talking about.

15         A.  All right.  At which time I also told him --

16     told the commissioner about the lying that had went

17     on with the promotional process with the 12 troopers,

18     the lieutenants that weren't given the opportunity

19     because of a mess-up in HR.  And I told him where I'd

20     gotten my information.

21              I met with the commissioner a third time,

22     text him, met with him a third time -- and I'll have

23     that date too --

24         Q.  Okay.

25         A.  -- telling him that he obviously was not

Page 14

1    leader of the House of Representatives.

2         Q.  Mike Sanders?

3         A.  Mike Sanders -- that Hunter and Prater and

4    Jari Askins had met and that the wrongdoing of the

5    commissioner had been brought up.  Now --

6         Q.  How long ago was that?

7         A.  I don't know.  Oh, the meet -- I don't know

8    when I was -- last two weeks --

9         Q.  (Inaudible) when that meeting would happen.

10        A.  Two weeks ago.

11        Q.  Okay.

12        A.  When I was told about it.  I don't know when

13   the meeting happened.  And that's why when you said

14   Prater was involved in this, I was wondering if that

15   was the deal.

16        Q.  Who -- go ahead.

17        A.  No.  I'm -- I'm all right.

18        Q.  You said you haven't -- you said that you

19   had the list of people you were going to tell.  Who

20   all was on that?

21        A.  OSBI because of state statute.  Command

22   staff.  I believe I still have the list.  I can give

23   it to you.  Senate.  The House.  Media.  I believe I

24   even had something in there:  anybody that I could

25   get to effect change.

Page 15

1        Q.  Okay.  So kind of a (inaudible)?

2        A.  That's -- (inaudible).  I had a list of who

3    I was going to contact, trying my best to get him to

4    do what's right.

5        Q.  Okay.

6        A.  I even told him in my meeting that I

7    couldn't go to (inaudible), even though he's in

8    executive branch.  I couldn't go to (inaudible)

9    because the governor was already protecting Captain

10   Rogers, and she wasn't going to do anything.  She was

11   a lame duck, and the election hadn't been decided

12   yet.  So I couldn't go to Stitt or to Edmondson.

13          But I even told them whoever made it was

14   going to go.  It was after this meeting that I said,

15   "I'm going to do this if you don't effect change.

16   I'm going to do this," is when he started telling me,

17   "Well, I'm going to help you get the emergency

18   management (inaudible).  I'm going to help you get

19   there."

20          And I told him, I said, "You can glad-hand

21   me all you want, but I told you what I want."  And he

22   didn't.  So it wasn't long after that I went to the

23   president pro tem of the Senate's office.

24       Q.  Okay.  Who all -- who all knows about this?

25   Who all knows about the recordings, the meetings?  I

Page 18

1      A.  And that's not because it's anything

2   criminal.  I just don't -- until I'm forced to tell

3   that, I'm not going to include those guys in -- in

4   this.

5      Q.  Okay.  And I'm not going to be the one to

6   force you to tell that.

7      A.  I understand.  No, I understand.

8      Q.  Okay.  So you said you had three meetings.

9   Where did those -- so one happened at Charleston's,

10  you said.

11     A.  Okay.  The first one happened in his office.

12  Wanda is the one that -- that let me in it, told him

13  I was there.

14          MR. PARISH:  You said Wanda?

15          MR. GERMAN:  Wanda.  Is that her name?

16     Q.  (By Mr. Holt) Yeah.  The one that sits right

17  in front.  Yeah.  Okay.

18     A.  The second one happened at Charleston's.

19  The third one happened at Starbucks over by Midwest

20  City by Tinker.  And, again, the dates and all that I

21  have on my time sheet.  I kept those dates up.  Major

22  McCoy knows about the meetings because I told him I

23  was meeting with the commissioner.  And --

24     Q.  Is he familiar with the content of the

25  meeting?

Page 26

1    judge me" -- I think the very words I said was, "Do

2    not judge me by yourself."

3         Q.   What do you think he meant by that?

4         A.   Captain, I think he wanted it to go away.

5    And he wanted to know what it was going to take to go

6    away.

7         Q.   Okay.

8         A.   I took it no other way.

9         Q.   Okay.  So did you ever -- did you ever --

10   have you ever cashed that in at all during any of

11   your conversations with the commissioner?

12        A.   No.

13        Q.   Okay.  So part of what Prater has asked us

14   to look into as part of the allegations are what

15   you're talking about.  The other part is -- is that

16   you have used that information in a way to try to

17   further yourself either into the OEM slot or into a

18   higher ranking job here.  Has that happened?

19        A.   No.

20        Q.   Okay.  Have you ever made any demands to the

21   commissioner at all relating to any of that?

22        A.   To benefit me?

23        Q.   To benefit you.

24        A.   No.

25        Q.   To benefit anybody else?

Page 27

1        A.   No.   The patrol as a whole, yes.   Change the

2    promotional process, assessment center, to have the

3    chief step down.

4        Q.   Okay.   So nothing -- but nothing that would

5    help any individual -- whether that be you, Brian,

6    anybody at all -- through the department?

7        A.   No.   I told him that his command staff was

8    tainted and that he needed to promote legit -- of

9    course, I was -- I'm ineligible -- but he needed to

10   promote legitimate leaders and not cheat, not -- not

11   your buddies.   It has to be assessment center and all

12   that.   But, no, not for me, not for Brian.   Oh, my

13   gosh, not for Brian.   Not for anybody.

14       Q.   Okay.   Did you -- did you ever give any

15   pieces of paper or any demands at all regarding

16   promoting you to major?

17       A.   No.   All I said was that the majors had to

18   be -- they were on this deal.   I told him, I said,

19   "These things have got to happen.   These are the

20   deadlines have got to happen," and that's when I slid

21   the piece of paper that had all the people that I was

22   going to contact on it, and I point blank told him

23   that he's going to have to make sure that the ones

24   that promoted -- that he's going to have to make --

25   the command staff was going to have to be a

Page 28

1    legitimate command staff, and he needed to promote

2    majors to command staff.

3        Q.   Okay.   You said "demands."   What -- what do

4    you mean by demand?   Time frames?   Tell me -- tell me

5    what you meant when you said slid across demands,

6    time lines.   What -- what's -- what's that?

7        A.   That -- well, before the -- before the

8    governor took over.   In other words, I will -- if he

9    takes care of this and changes this that I would go

10   on down the road, and it doesn't get aired out.

11       Q.   And so -- okay.   So tell me -- okay.   So you

12   say before the governor got elected.   Before Stitt --

13   or at that point I guess you didn't know.

14       A.   It was either Edmondson or Stitt.   That's

15   correct.

16       Q.   So the time line revolved around the

17   election.

18       A.   That's correct.

19       Q.   Okay.   Revolved around the election.   And

20   what -- so other than the names, what else -- what

21   else had revolved -- what else had to happen before

22   governors changed?

23       A.   Promotional process changed.   Legitimate

24   promotions, the legitimate promotions to major.

25   Legitimate promotions to lieutenant colonels.

Page 29

1    Legitimate promotions all the way around.  Captains,

2    lieutenants, whatever.

3            MR. PARISH:  Just to clarify, when you say

4    legitimate promotions to major, for example --

5            MR. GERMAN:  Tim Tipton.  Are you talking

6    about names?

7            MR. PARISH:  Well, yeah.  Sure.

8            MR. GERMAN:  Yeah.  The names of them --

9    these are my -- I didn't tell Rhoades -- I didn't

10   tell the commissioner this, but we're talking about

11   people who have earned it, what I -- and, again, this

12   is subjective.

13           MR. PARISH:  Sure, sure.  Tip Tipton.  Who

14   else?

15           MR. GERMAN:  Ronnie Hampton.  He's been on

16   the list before that I know of.  Alan Henry has been

17   the list before.  David -- Jason Holt's been on the

18   list before that have served their time and all that.

19           MR. PARISH:  So would your request or your

20   requirement or your demand or what you wanted to see

21   different, would it have been to eliminate the majors

22   that are there and --

23           MR. GERMAN:  No.

24           MR. PARISH:  -- replace them?  Just add to.

25           MR. GERMAN:  Add to.  They're going to be --

Page 30

1    there's going to be attrition.

2           MR. PARISH:  Okay.  All right.

3      Q.  (By Mr. Holt) You know, so was it by -- I

4    mean, were they just random dates?  Was it the

5    election date?  What...

6      A.  I -- I think I gave him dates because of the

7    election.  It was all hinged around the election.

8    Maybe even the -- yeah, I guarantee you it would

9    all -- it would all have hinged around the election.

10     Q.  Okay.

11     A.  Because that would have made the difference

12   to me on when I was going to go and who I was going

13   to go to.

14     Q.  And so if he didn't have those things

15   changed or at least --

16     A.  Effect positive change was always what I

17   said.  Effect positive change.

18     Q.  -- by then, then you said you were going to

19   go --

20     A.  Further up.  Whatever --

21     Q.  Further up.

22     A.  -- it needed to take.  Senate, House, media,

23   whatever it took.

24          MR. PARISH:  You told me that, Senate,

25   House, media.  So he was -- he knew where you were

Page 31

1   talking about.

2           MR. GERMAN:  Oh, yes.  He saw it, yes.  Sure

3   did.  Saw the piece of paper I gave him.  Yes.

4   Absolutely.

5       Q.  (By Mr. Holt) If he didn't -- so you said

6   you went to Treat's.  Was Treat -- what -- what

7   triggered you -- when did you go see Treat?  Or go

8   see whoever it was at Treat's office.

9       A.  It's on my time sheet.

10      Q.  Okay.  What triggered you to do that?  Was

11  it past the date that --

12      A.  Yes.  No change was being effected.

13      Q.  Okay.  Did you ever come out -- and when you

14  start talking -- so you said you did give names of

15  who needed to be promoted, or you didn't give names?

16      A.  No.  I've given the names here.

17      Q.  Okay.  You didn't give it to the

18  commissioner.

19      A.  No.  No.  No.  I'm talking legitimate

20  promotions.  Legitimate promotions.

21      Q.  Yep.

22      A.  And I even told him, I said selfishly --

23  talking about me personally -- selfishly, the human

24  aspect of what I'm doing even comes into effect that

25  I -- that I look at the way things are being done and

Page 34

1    said was to effect change.

2         Q.   Okay.  So -- so don't let me misquote you.

3    So -- but part of the demands were if you didn't see

4    some of those things that you had said were problems

5    prior to a certain date, whatever date's on the note,

6    then you were going to turn that information over to

7    the list of OSBI, the Senate, media --

8         A.   Yes.

9         Q.   -- those places.

10        A.   Yes.

11             MR. PARISH:  And -- and when you say "effect

12   change" -- sorry to interrupt, but something's come

13   to my mind -- that's a broad term for the things that

14   you had detailed that you wanted to see.  Command

15   staff changes, chief step down, were that -- all

16   those things included in -- in your change?

17             MR. GERMAN:  Yes.

18             MR. PARISH:  Okay.

19             MR. GERMAN:  Guys, this is -- this is a

20   broad statement.  Our culture and our ethos isn't

21   what we say it is.  That's just the bottom line.

22        Q.   (By Mr. Holt) What do you mean by that?

23        A.   We say we're the best.  We say that we have

24   high integrity.  High morals.  No, we do not.  We do

25   have some on the patrol that do.  Don't hear what I'm

Page 46

1      only the ones with Brian?  Or were there other

2      recordings?

3            A.   That's it.

4            Q.   Okay.  And then just -- just to make sure,

5      just to kind of reiterate this "effect change

6      business" that you -- that you're referring to -- and

7      I don't -- I don't disagree with one bit -- how would

8      you know -- if you could explain it to me, how would

9      you know as -- I don't know.  For lack of a better

10     term -- an agent of change that that change had been

11     actually effected?

12           A.   I'd see it in policies, promotional

13     policies, being changed --

14           Q.   Okay.

15           A.   -- towards an assessment center.  The chief

16     being disciplined or held accountable for his

17     actions.

18           Q.   So you would just -- you could sit back and

19     watch and see if things were --

20           A.   That is correct.

21           Q.   Right.  And know that -- that they were

22     things that you in fact had --

23           A.   And -- and hence the deadlines.

24           Q.   Right.

25           A.   I could see them happening.

Page 47

1       Q.   So --

2       A.   It would have even have been better if he

3    would have promoted a couple of majors, captains to

4    majors, to effect the change in the command staff or

5    -- just because of the way our culture is.  But

6    that's okay.

7       Q.   Let me ask you this:  Did you -- did you

8    have suggestions for the commissioner as far as...

9       A.   I mentioned about not being top five, that

10   when he came in, he went from top three to top five

11   to top ten.  Talked about why go to ten?  Why leave

12   it open for more people?  Assessment center.  I

13   mentioned the assessment center.

14      Q.   What do you mean by that?

15      A.   The assessment center?

16      Q.   Uh-huh.

17      A.   Okay.  There are agencies -- well, it's a

18   national deal.  State agencies, fire, law

19   enforcement, all kinds of agencies, that have what's

20   called an assessment center.  It's an outside entity.

21   For instance, we have people that go out of state and

22   sit on these boards in these assessment --

23      Q.   Right.

24      A.   -- centers.  Same thing.

25      Q.   So it's not an internal?

Page 48

1      A.   Less internal.

2      Q.   Okay.  So -- so you'd have outsiders

3  actually picking a lot of those -- at least a portion

4  of your --

5      A.   Right.  Like, the top three -- I think the

6  rule is the rule of three with the top three

7  (inaudible) commissioner, and they would pick from

8  the top three.

9      Q.   Okay.  Promotional process changes.

10      A.   Yes.

11      Q.   Assessment center.  Promotions.  Actual

12  command (inaudible) promotions.  Promotions to major

13  occurred.  And discipline the chief.  Deal with the

14  chief.

15      A.   Deal with it.

16      Q.   (Inaudible.)

17      A.   Yeah.  Whatever it is.

18      MR. PARISH:  You want your chair back

19  (inaudible)?  We were just visiting.  I was just

20  trying to make sure I understood exactly.

21      MR. GERMAN:  Okay.  So we have -- so we have

22  got to change the course of the patrol.

23  BY MR. HOLT:

24      Q.   So have you ever -- did you ever go to the

25  chief with your issues that you have?  Straight to

Oklahoma Department of Public Safety
**Oklahoma Highway Patrol**

**SUPPLEMENTAL FORM**

[X] OHP Investigation
[ ] Agency Assist

**Page 1 of 3**

TITLE OF REPORT **CAPTAIN TROY GERMAN INTERVIEW**

On Monday, December 17, 2018, at 9:38 A.M., Captain TROY GERMAN was interviewed pursuant to criminal investigation case number 18-0631CI. GERMAN is employed by the Oklahoma Highway Patrol (OHP) and is assigned as the Troop D troop commander. Troop D is located at 1501 South George Nigh Expressway, McAlester, Oklahoma 74501. The contact telephone number is ███████████. GERMAN was interviewed by Captain JASON HOLT and Trooper JIM PARISH. The interview was conducted at the OHP Investigations Division Headquarters. After being informed of the reason for the interview and being advised of his Miranda Warning, GERMAN provided the following information.

On Tuesday, July 17, 2018, GERMAN was contacted by Lieutenant BRIAN ORR, who has since been promoted to captain. ORR told GERMAN he had received a telephone call from Chief MICHAEL HARRELL providing him with the answers to the oral interview board, for the OHP promotional process. GERMAN asked ORR what the answers were and ORR told him what they were. That afternoon, GERMAN met ORR at the Bricktown Brewery in Shawnee, Oklahoma to study for the oral interview, with the information from HARRELL. GERMAN recorded the conversation. ORR quoted the answers given to him from HARRELL and showed GERMAN what he had written down.

GERMAN recorded four to seven conversations with ORR, all with his personal iPhone. On the day of the interview, GERMAN had left his phone with Captain TIM TIPTON. No one else, but GERMAN, had ever heard the recordings. GERMAN made a "hand-full" of people aware of the recordings in order to protect himself. GERMAN refused to name the people he made aware of the recordings. In those recordings, ORR said Commissioner RUSTY ROADES was aware HARRELL provided ORR with the answers to the interview questions. RHOADES and HARRELL were in a vehicle together when HARRELL provided the answers during a telephone call.

Also in one of the recordings, ORR revealed that RHOADES had spoken to him at the Capitol, just before the promotional orders were disseminated. RHOADES told ORR many of the legislators thought he should be promoted and that he would be promoted to captain of Troop R. RHOADES went on to tell ORR, the promotion to captain at Troop A was down to two lieutenants, JOE LANG and JOE WILLIAMS. RHOADES asked ORR who he thought should be promoted.

GERMAN met with RHOADES three times prior to ORR's promotion, which was effective September 1, 2018. GERMAN noted each meeting with RHOADES on his Individual Daily Time Reports and also informed Major JACK MCCOY of each meeting.

| INVESTIGATING TROOPER | BADGE # | TROOP | COUNTY | AGENCY CASE # | DATE OF REPORT |
|---|---|---|---|---|---|
| TRP MICHAEL WALLACE | 708 | Z | OKLAHOMA | 18-0631CI | 01/03/2019 |

This report is the property of the Oklahoma Highway Patrol and is loaned to your agency. It and its content are to be considered LAW ENFORCEMENT SENSITIVE and are not to be distributed outside your agency.

**EXHIBIT**

**1**

Case 5:19-cv-00751-F Document 65-12 Filed 11/02/20 Page 23 of 24
Case 5:19-cv-00751-F Document 33-1 Filed 07/13/20 Page 2 of 3
18-0631CI

**CAPTAIN TROY GERMAN INTERVIEW**

**Page 2 of 3**

A few days after ORR's promotion, German met RHOADES in his office for a two-hour meeting. GERMAN told RHOADS about cheating he had found out about within the promotional process, involving HARRELL and ORR. GERMAN told RHOADES that HARRELL was a liar, cheat, drunkard, and hypocrite. GERMAN wanted RHOADES to do what was right. GERMAN suggested that RHOADES not tell HARRELL about the meetings, because GERMAN thought HARRELL would take reprisals against him. GERMAN also told RHOADES he should not tell ORR about the meeting.

GERMAN had a second meeting with RHOADES at the Charleston's restaurant near the Kilpatrick Turnpike. GERMAN told RHOADES that HARRELL was lying and not effecting change, because the promotional process was going to change from five to ten applicants. This was not the positive change GERMAN was talking about. GERMAN also told RHOADES about twelve lieutenants who did not get a promotional opportunity due to a mix up within Human Resources. GERMAN told RHOADES he had to effect change or he (GERMAN) was going to take matters further. Again, no change was made.

GERMAN had a third meeting with RHOADES at a Starbucks near Tinker Air Force Base in Midwest City. GERMAN provided RHOADES a list of people GERMAN planned to contact about the cheating in the promotional process. That list included the Oklahoma State Bureau of Investigation (OSBI), the OHP Command Staff, the House and Senate of Oklahoma, the media, and anyone who could help "effect change." GERMAN gave RHOADES demands and a time-line to have those demands met.

The timeline was incremental and would end when the new Governor took office. GERMAN told RHOADES if he made the correct changes, GERMAN would "go on down the road," and none of the issues would be "aired out." The demands consisted of HARRELL being held accountable, a better promotional process implemented and legitimate promotions be made. RHOADES told GERMAN he could not promote him at this time. GERMAN told RHOADES he did not want to be promoted, but wanted HARRELL to be held accountable and for RHOADES to fix the promotional process. RHOADES voiced his support of GERMAN for the Director of Emergency Management Position and said he would write him a letter of recommendation.

GERMAN would know if RHOADES was effecting the change he had told him to effect. He would be able to see if the change in policy and promotional orders had occurred before the deadline he had given him, including the implementation of a less-internal promotional process. HARRELL would be held accountable. Good captains would be promoted to majors.

This report is the property of the Oklahoma Highway Patrol and is loaned to your agency. It and its content are to be considered LAW ENFORCEMENT SENSITIVE and are not to be distributed outside your agency.

18-0631CI

CAPTAIN TROY GERMAN INTERVIEW

Page 3 of 3

In the course of the three meetings, GERMAN told RHOADES if he was reappointed by the new Governor, GERMAN would not stay with the agency, he would not work for a man as corrupt as RHOADES. GERMAN said he did not record the meetings with RHOADES, but did not know if RHOADES had recorded them. GERMAN believed RHOADES and HARRELL were "colluding" or speaking together about helping ORR cheat on the promotional interview.

GERMAN went to the office of the Oklahoma Senate President Pro Tempore, GREG TREAT, and told everything to KEHL, TREAT's assistant. KEHL told GERMAN she would schedule a meeting with TREAT. That meeting did not occur. GERMAN did not remember the date of the meeting, but it was noted on his Individual Daily Time Report. GERMAN also expressed his concerns to Oklahoma Senator ROGER THOMPSON.

Two weeks before this interview, GERMAN was told by Representative MIKE SANDERS a meeting took place between DAVID PRATER, MIKE HUNTER, and JERRI ASKINS, where the wrongdoings of RHOADES were discussed.

A handful of people knew about GERMAN's recent activity in case the administration attempted to hold him accountable for such action. He did not want to list all these people at this time. GERMAN had taken his concerns to Major BRENT SUGG.

GERMAN said years ago, then Assistant Commissioner BILLY MCLURE, lost his job when then-Commissioner KEVIN WARD had a seven hour meeting with GERMAN over GERMAN's complaints with leadership. GERMAN told WARD change would be effected. After the meeting, WARD told GERMAN that MCLURE would be gone within two weeks and if MCLURE was not let go within two weeks, GERMAN should continue with what he felt he had to do because WARD could not get it done.

Note: This interview was recorded. The digital file is included with this case.

This report is the property of the Oklahoma Highway Patrol and is loaned to your agency. It and its content are to be considered LAW ENFORCEMENT SENSITIVE and are not to be distributed outside your agency.