1

1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE WESTERN DISTRICT OF OKLAHOMA

3
    TROY D. GERMAN,                    )
4                                      )
         Plaintiff,                    )
5                                      )
    -vs-                               )        No. CIV-19-751-F
6                                      )
    BILLY D. "RUSTY" RHOADES,          )
7    individually;                     )
    MICHAEL HARRELL, individually;)
8    BRIAN ORR, individually; and      )
    MEGAN SIMPSON, individually,       )
9                                      )
         Defendants.                   )
10

11

12

13                    * * * * *

14           DEPOSITION OF DAVID WAYNE PRATER

15           TAKEN ON BEHALF OF THE PLAINTIFF

16             IN OKLAHOMA CITY, OKLAHOMA

17                 ON JUNE 17, 2020

18             COMMENCING AT 1:56 P.M.

19                    * * * * *

20

21

22               INSTASCRIPT, L.L.C.
             101 PARK AVENUE, SUITE 910
23           OKLAHOMA CITY, OKLAHOMA  73102
                   405.605.6880
24             schedule@instascript.net

25   REPORTED BY:  BETH A. McGINLEY, CSR, RPR

 1       Q    And so that's true even for law enforcement

 2    officers investigating a potential crime?

 3       A    Yes.

 4       Q    Okay.  All right.  So on Thursday -- or on

 5    Tuesday, December 11th, you did end up meeting with

 6    Commissioner Rhoades, Mike Harrell and Megan Simpson --

 7       A    Yes.

 8       Q    -- true?

 9       A    Yes, sir, I did.

10       Q    Okay.  Do you recall where that meeting took

11    place?

12       A    Yes, sir.  My administrative assistant, Jane

13    Atkinson, sometime right around 9:00 -- I don't remember

14    if they were a little bit late or not, but sometime

15    right around 9:00, advised me that -- that Commissioner

16    Rhoades was -- was here, and I asked her to put a -- put

17    him in the war room.  That's a -- it's a -- basically, a

18    small conference room in our office where we do a lot of

19    trial prep and things like that, but it's also used as a

20    small conference room when I have law enforcement come

21    to me and bring me cases and things like that.  Not

22    uncommon.

23            If you were to come visit with me, I'd -- I'd

24    put you in the war room and we'd have a conversation.  I

25    normally don't bring people directly into my office

1  because I have -- it's too messy, No. 1, but I have a

2  lot of sensitive information and files all around me.

3         So we met in the war room.  And I asked Jane

4  Atkinson to -- to go get Commissioner Rhoades, put him

5  in the war room.  And I walked on in and I saw Chief

6  Harrell sitting directly across the table from

7  Commissioner Rhoades and then a -- a lady that I did not

8  know, sitting to Commissioner Rhoades' right, ends up

9  being Megan Simpson.

10     Q    Okay.  And who did you learn that Megan

11 Simpson was?

12     A    I believe she was general counsel, DPS, at

13 that time.

14     Q    All right.  Would you describe for the Court

15 and jury the substance of that meeting, in terms of what

16 Commissioner Rhoades and the others said to you and what

17 you said to them?

18     A    Sure.  After a little bit of small talk and --

19 and, again, Commissioner Rhoades introduced me to

20 Ms. Simpson, who I did not recall -- had not recalled

21 meeting to that point.  We had some small talk with

22 Chief Harrell and -- and just general, "How are you all

23 doing, everything been good, it's been a long time since

24 I've seen you," type of deal.

25         And I said, "Well, obviously, there's

1              So I said -- I said, "Blackmail you?  You

2    know, how in the heck do you blackmail the Commissioner

3    of Public Safety?"  And -- and he says, "Well, we

4    believe that -- that -- that Troy is -- he's upset about

5    some things, he didn't like the way some things have

6    gone on, and that he now has some -- is alleging he has

7    some damaging information against me and the Highway

8    Patrol that he is threatening to go public with unless I

9    do certain things."

10        Q    Did you come to learn what the damaging

11   information was?

12        A    No, not really.  I mean -- and, again, this --

13   this went on for a little while.  I said -- I said,

14   "Listen, how did this go down?  What are you -- you

15   know, did this happen in your office or what?"

16             And so he said, "Well" -- he said, "I got a

17   call from Troy" -- and, excuse me, I'll -- "Mr. German."

18   And I can't remember exactly how Commissioner Rhoades --

19   whether he said "Troy" or "Mr. German."  I'll just say

20   "Mr. German" from now on, so I'll be appropriate.

21             He said he received a call from Mr. German

22   requesting a meeting and that they had a meeting and, in

23   that meeting, there were certain demands that were made

24   by Mr. German to Commissioner Rhoades that -- that, if

25   met, it didn't seem like there was going to be a

1   wants to meet with you, and you meet with him off site

2   at a restaurant or the -- or the coffee shop" --

3   whichever it was he told me -- "you don't take anyone

4   with you."  I said, "You've got general counsel sitting

5   down at the end of the table, I'm sure she was available

6   and possibly Chief Harrell, and -- and -- and you don't

7   even record the meeting?"

8            "No."

9            I said, "Okay, well, then, what did -- what

10  did Mr. German do?"

11           "Well, he made certain requests of me to do

12  certain things and then he put his hand down like

13  this" -- (indicating), and I've got all my fingers down

14  on the table -- "acting like he had a piece of paper as

15  he was talking, saying, 'There are -- there's some

16  damaging information that I have on you and the Highway

17  Patrol and I could release it if you don't do the things

18  I want you to do.'"  And --

19      Q    And you're making a motion, pushing your hand

20  forward on the table?

21      A    Yes, sir, as if -- as if, as Commissioner

22  Rhoades described it, Mr. German had a piece of paper,

23  which I guess was an imaginary piece of paper he put

24  down on the table they were sitting at.  Mr. German then

25  placed his hand -- the motion that Mr. Rhoades made was

1   that Mr. German placed his hand down on the imaginary

2   piece of paper, like he'd written a bunch of allegations

3   down and he was pretending to shove it across -- or make

4   the motion that he was shoving this piece of paper

5   across, toward Commissioner Rhoades.

6           And I said, "Well, where's that piece of

7   paper?"  And he said, "Oh, it wasn't really a piece of

8   paper, he was just acting like he had a bunch of

9   information that he was shoving across the table toward

10  me."

11          I said, "So you didn't have anything written

12  out from Mr. German, talking about the type of

13  information that he knew, that he was willing to release

14  if you didn't meet his -- his request?"  And he said,

15  "No."  And I said, "Well, then, what, specifically, did

16  he say?"  And he said, "Well, you know, he -- he -- he

17  wasn't happy about some things and -- and -- and there

18  was a recent promotion that he didn't get."  And I said,

19  "Well, okay."

20          "And -- and there were some things he wanted

21  changed in the Highway Patrol."  I said, "But what,

22  specifically, is he asking you to do?"

23          And -- and, again, it didn't really get

24  specific.  "Well, you know, he -- he wasn't happy about

25  a recent promotion and -- and there were some changes in

1   command that he said he wanted and -- and wanted some

2   other changes in the Highway Patrol."

3            And I said, "Okay.  Why was Troy German asking

4   you to make these changes?  I mean, what had happened

5   here?"

6            And he said, "Well, you know, Troy -- Troy is

7   just -- seems to be disgruntled and -- and he's just --

8   he -- we just don't have a good relationship and -- and

9   he's unhappy about some things."

10           I said, "Listen, when I was a police officer,

11  if I saw things in my agency that I felt like needed to

12  be improved, I'm not going to have a meeting like what

13  you're describing, but I may go to my supervisor and

14  say, 'Hey' -- you know, first of all, if I didn't feel

15  like I was promoted and it wasn't fair, I -- I may talk

16  to you about that.  If there are improvements that can

17  be made regarding policies and procedures that the

18  Police Department is involved in that I don't like, I

19  may talk to you about that -- what out of bounds was it

20  that you felt like Troy German was -- was talking to you

21  about?"

22           "Well, just -- the things that he wanted just

23  really weren't appropriate and more -- it seemed more

24  like he had some kind of a general interest in either

25  being promoted or getting the homeland security position

1    that he was up for -- he -- you know, that's -- that's

2    what he really seemed interested in at that point."

3         Q    And Rusty Rhoades said that?

4         A    Rusty Rhoades said that.

5              And I said, "I wasn't even aware that

6    Mr. German was interested in the homeland security spot,

7    the Oklahoma Homeland Security spot."  He said, "Yeah,

8    he's been really jockeying for that," and whatever else.

9    I said, "Oh, okay, I hadn't even heard that."

10             And I said, "So, then, what is the information

11   that Mr. German has that he is threatening to release

12   if, in fact, you don't do what he wants you to do?"

13   And --

14        Q    And what did he say?

15        A    He said, "Well, he doesn't have anything on

16   me."  And I said, "Okay, then, what could he possibly

17   be -- be talking about?  I mean, is he going to

18   fabricate information, was he saying, 'Hey, you know, I

19   know this about you, there are rumors about you'?"  And

20   he said, "No, no, no, he didn't do any of that.  He just

21   said he had damaging information on me," and, again,

22   acted like he was shoving that imaginary piece of paper

23   across the table, that had all this information, toward

24   Commissioner Rhoades.

25             And I said, "So -- so Troy German calls you,

1    wants to have a meeting with you, you don't take anyone

2    with you, you don't record the meeting, he makes these

3    general requests of you about promo- -- a promotion

4    that's just happened that he's not happy about and --

5    and there's some things that need to be changed in the

6    Highway Patrol and a change in command, or whatever,

7    like that, and -- and that's -- that's as specific,

8    basically, as he got with you at that point, and then

9    when -- when I ask you what it was that he's threatening

10   to release, you say he's got nothing on you, what could

11   he have?"  I said, "This isn't blackmail at all."

12            And that's when Ms. Simpson piped up and said,

13   "Listen, I've looked at the elements of this crime, this

14   is blackmail."  And she indicated to me that she had

15   been an Assistant DA somewhere in the state.  That was

16   fine.  I'm the DA of Oklahoma County and I make these

17   decisions.

18            And I just told Rusty, I said, "Hey, that's

19   not a blackmail, man."  I said, "So" -- and he said,

20   "Well, there was another meeting," and just kind of

21   volunteered that.  And I said, "So after this meeting

22   where Troy German has allegedly blackmailed you, you

23   have another meeting with him?"

24       Q    Did Rusty Rhoades tell you he had a firm and

25   definite conviction that he was being blackmailed in the

1    each of their responses, if any?

2        A    And -- and, again, I think Ms. Simpson just

3    continued to tell me that she felt like that -- that

4    what Commissioner Rhoades had described to me did meet

5    the elements of blackmail and I -- I told her I felt

6    like she was wrong, that this was not blackmail, I was

7    greatly suspicious of the information that I had been

8    told by Commissioner Rhoades and that I felt like there

9    was something he was holding back on, if -- if not, flat

10   out, lying to me.

11       Q    Did Commissioner Rhoades ask you to file

12   blackmail charges against Troy German?

13       A    He did.

14       Q    Did Chief Harrell ask you to file blackmail

15   charges against Troy German?

16       A    I'm sorry, I don't recall whether he asked --

17   specifically asked me for that or not.

18       Q    Did Megan Simpson specifically ask you for

19   that?

20       A    She said she felt like -- she felt like the

21   elements had been satisfied and that -- that I -- that I

22   had every right in the world to go ahead and proceed and

23   file blackmail charges against Mr. German.

24       Q    Was it your perception, as the elected DA of

25   Oklahoma County, that both Chief Harrell and Megan

1    Simpson were there supporting Rusty Rhoades' request to

2    get you to charge Troy German with blackmail?

3         A    Yes, sir, that was my perception.

4         Q    Did you ask Rusty Rhoades if he had conducted

5    any investigation into this blackmail?

6         A    So after we got to the end of this very

7    unusual and what ultimately ended up being slightly

8    contentious meeting, I said, "Listen, Commissioner" --

9    well -- so let me back up one step.

10        Commissioner Rhoades said this, he said,

11   "Well, I knew when I called you that you would shoot

12   straight with me and, no matter what you felt about what

13   I was telling you, you'd tell me the truth."

14        And I said, "Rusty, that's just the way I am,

15   man."  I said, "I have nothing against you or Chief

16   Harrell," I said, you know, "and -- and -- and -- or

17   anyone else here, but -- but this is not a blackmail."

18   And I said, "The worst thing in the world that could

19   happen to you and the Highway Patrol is for me to just

20   go ahead and file this charge."

21        And he said, "Well, what do you mean by that?"

22        And I said, "Because, No. 1, it's not

23   justified, but let's just say I go ahead and do it,

24   anyway.  Everything that Troy German has alleged that

25   you've done will be proven true and it will de- -- it

1    will take you down, it's going to make the Highway

2    Patrol look horrible."  I said, "I don't even know why

3    you would want me to file blackmail charges against Troy

4    German.  It would be the worst thing that you could

5    imagine happening.  I mean, it's going to be a fire

6    storm, is what's going to happen, and it's going to make

7    you look bad, it's going to make Chief Harrell look bad,

8    it's going to make the Highway Patrol look bad."

9         Q    You said this to him?

10        A    I did say that to him.

11        Q    And what did he say in response?

12        A    He said, "Well, I disagree.  I don't think it

13   would be a problem and I think that blackmail has

14   occurred here and I think, ultimately, that's what we

15   need to do."

16             And I said, "Okay."  I said, "Since you seem

17   to feel so strongly about this matter and that Troy

18   German has blackmailed you, where's the probable cause

19   affidavit or where's my investigation?  Let me read

20   through it, let me see what we've got, whatever."

21             And he said, "I don't have that."

22        Q    What is the probable cause affidavit?  What

23   does that mean?

24        A    Sure.  When a police officer brings charges,

25   whether it's a misdemeanor or a felony, they're required

1    to set out, with -- with specific facts, the -- the

2    elements of the crime:  On a certain, certain date, this

3    person committed this act, and they did these certain

4    things, which satisfies the elements of this crime,

5    swear or affirm, law enforcement officer, and -- and

6    that's what a judge looks like to ultimate- -- looks at

7    to ultimately approve the probable cause affidavit that

8    allows a warrant to issue.

9         Q    And that document is signed under oath?

10        A    It's notarized.

11        Q    And so the law enforcement officer is swearing

12   that it is true and correct to the best of his or her

13   knowledge?

14        A    Yes, that's correct.

15        Q    Okay.

16        A    And so I asked Commissioner Rhoades -- I said,

17   "Then you give me your probable cause affidavit and you

18   give me your investigation."  And he said, "I -- I don't

19   have that."  And I said, "Okay, then -- then tell me

20   about the investigation."  And he said, "It hadn't been

21   investigated."  I said, "Who did you report this to?"

22   And he said, "Well, no one."

23             And I -- obviously, Ms. Simpson knew about it

24   and Chief Harrell, but he didn't indicate anyone else

25   was aware of -- of the allegations or that they were

1    going to come to me and ask that charges be filed

2    against Troy German.

3              And I said, "Okay, you feel so strongly about

4    this," I said, "have it investigated.  You -- you make a

5    report, you give your statement to your investigators,

6    they follow up, they pursue, they get video from

7    wherever it was that you guys were meeting at, whatever

8    they can get to corroborate the things that you have

9    alleged here against Troy German, and you have them

10   bring it to me and I -- you have -- you have my pledge

11   on this:  If, in fact, after reviewing that

12   investigation, if I believe that Troy German blackmailed

13   you, I will file charges on him."

14             And he said, "Well, who are we going to get to

15   do that?"  And I said, "I don't know."  And he said,

16   "Well, we can't let the Highway -- we can't let the OSBI

17   do it because of Ricky Adams."

18        Q    Who is Ricky Adams?

19        A    Ricky Adams is the former Chief of the Highway

20   Patrol that had been fairly unceremoniously forced out

21   and -- and was then director of -- and still is director

22   of the Oklahoma State Bureau of Investigation.

23        Q    Is it common, when there may be a conflict or

24   an investigation involving a member of a law enforcement

25   agency, for the OSBI to conduct the investigation?

1    hearsay, that would not be competent evidence to rely

2    on, solely, to convict someone.

3         Q    Before the preliminary hearing took place or

4    before it was scheduled to take place, did you have a

5    meeting with Assistant Attorney General Dane Towery?

6         A    I did, and I believe that -- that was preceded

7    by a call to General Hunter, and I said, "Mike, what

8    happened here?"

9         Q    So let me -- let me stop you and back up.

10        A    Sure.

11        Q    When did you contact General Hunter?

12        A    It was before I spoke to Dane Towery, which

13   would have been -- I think I spoke to -- to AG Towery a

14   couple weeks before the preliminary hearing was set.

15   And -- and so it would have been a little bit prior to

16   that.  And I -- I called -- and, I'm sorry, I don't have

17   a date.

18        Q    Okay.

19        A    But I called General Hunter and I said, "Mike,

20   this is not right."  I said, "Something's happened

21   here."  I said, "I don't know what."  I said, "But, you

22   know, I asked Commissioner Rhoades to have Troop Z

23   investigate this deal and bring it to me and he didn't.

24   And he shows up on your doorstep.  I'm sure you didn't

25   know that he had come talked to me and I said this isn't

David Prater
6/17/2020

1    blackmail, but he shows up on your doorstep and one of

2    your Assistant Attorney Generals presented it to the

3    grand jury and -- and -- and there's an indictment now

4    on -- on Troy German."

5           I said, "This is wrong."  I said, "I don't

6    know what was presented, but -- but -- but this is

7    wrong.  And I'm going to" -- I said, "I'm going to be a

8    witness for the defendant in this case and, you know, I

9    really do -- would like to talk to -- to Dane,

10   Mr. Towery, your Assistant Attorney General, about this

11   matter and" --

12        Q    So Dane Towery had not reached out to you, to

13   talk to you about your conversation with Rusty Rhoades?

14        A    No, because I don't know if he knew about it.

15        Q    Okay.  All right.  And so what did Attorney

16   General Hunter say?

17        A    Said absolutely, he'd talk to him.

18        Q    Okay.  Did he have anything else to say during

19   this phone call?

20        A    No, not that I recall.

21        Q    Okay.

22        A    Not that I recall.

23        Q    So then you met with -- or you spoke to Dane

24   Towery.  Was that in person or over the telephone?

25        A    I -- I -- and I don't remember -- excuse me --

1   I think I called and left a message for -- well, let me

2   back up.  I'm not sure if -- if, based on my

3   conversation with Mike Hunter, that Dane Towery called

4   me, or if I initiated the phone call.  But, ultimately,

5   I did meet with Dane Towery in the Attorney General's

6   Office, actually in Mike Hunter's conference room, just

7   me and him.

8        Q    Just you two?

9        A    Yeah.

10       Q    And what did you tell him during that meeting?

11       A    I laid out everything that I've related to you

12   today, to -- to Dane Towery, and I said -- and, you

13   know, I -- I've got to be careful, in my position, to

14   not attempt to influence lawyers, generally, and -- but

15   especially, I -- you know, lawyers in other agencies.  I

16   mean, I don't -- I don't want to do that.

17            And so I didn't want him to think that the DA

18   of Oklahoma County is coming in and going to pound the

19   table and demand he do this or demand he do that and

20   call him stupid or whatever, because I wasn't going to

21   do that.  That was not my intent.  But he needed to know

22   the story, because I -- I -- I felt certain that he

23   didn't know everything that had happened on the

24   December 11th.

25       Q    And when you left that meeting, did you still

1   have that certainty, did you believe that he didn't know

2   what you relayed?

3       A    Yes, he did not -- he -- he indicated to me --

4   he said, "Well, I -- this is the first I've heard of any

5   of this.  I didn't know about that."

6            And I said -- I said, "Dane" -- it's

7   Mr. Towery, but I said -- I said, "You've got a direct

8   witness to the alleged crime, the blackmail, who's the

9   victim, who's a law enforcement officer, why didn't he

10  testify?  You've got to put him on."

11      Q    And what was Dane Towery's response to that?

12      A    I -- I -- I believe -- and, again, he was not

13  the supervisor of that unit, okay?  I believe that what

14  he indicated to me was -- is that there was a discussion

15  among the team and that somewhere -- someone in his

16  chain of supervision, maybe even just the -- the leader

17  of the multi-county grand jury team, had said, "No,

18  we're just going to call Troop Z and they're going to

19  lay out the investigation."

20      Q    All right.  When you left that meeting, did

21  you know whether or not the charges would be dismissed

22  or if the AG's Office would go forward with the

23  preliminary hearing?

24      A    I have a great deal of confidence in Mike

25  Hunter.  I have a great deal of confidence in -- in --

1        A     No.  No, he didn't.

2        Q     Did he challenge any of the information that

3    you gave to him?

4        A     No, and, you know, listen, this is a -- a

5    private meeting between lawyers, but it's important here

6    because the truth is very important, and so even though

7    I respect a private conversation with another lawyer,

8    I'll tell you, I felt like he was very surprised to

9    learn about the December 11th meeting, very surprised

10   to -- to know what I was told and that I had asked that

11   Troop Z come back to me and, in fact, they had not.

12       Q     Did you tell Dane Towery that you thought Troy

13   German was innocent?

14       A     I told Dane Towery I felt like Troy German did

15   not commit the act of blackmail.

16       Q     Did you, ultimately, testify at a preliminary

17   hearing?

18       A     No, I did not.

19       Q     Did you appear for your testimony at a

20   preliminary hearing?

21       A     Without being called, I -- I went to the

22   courtroom that morning to determine if, in fact, I would

23   be called.  And I'll tell you why.  I -- and, again,

24   Michael Johnson and -- and Gary James were having

25   multiple conversations with me over the weeks leading up

1    that -- that Mr. German was treated fairly by the -- the

2    justice system in this state.

3         Q    You weren't trying to help out Gary James; I

4    mean, you -- you've known these people professionally

5    for years and worked opposite them on many cases,

6    correct?

7         A    Yeah, and I -- yeah, I -- I think both of

8    those men would tell you that -- that if I feel

9    righteous about a case, I'm not going to do anything to

10   help them.

11        Q    And so when you came down there to ensure that

12   Mr. German was treated fairly, what actually happened?

13        A    I walked into -- I believe it was -- it's that

14   middle courtroom on the fifth floor of the Oklahoma

15   County Courthouse.  I believe it was Judge Savage's

16   courtroom, even -- even then, Kathryn Savage.

17             And I walked in and I saw Dane Towery and I

18   just -- I said, "Hey, you know, I'm -- I'm going to be

19   testifying for the defense."

20             He said -- and -- and I believe it was right

21   then, I mean, he just smiled and said, "We're kicking

22   it.  He's -- he's retiring and we're kicking it."

23             Which, prosecutor shorthand, means we're

24   getting rid of this case, it's getting dismissed.

25        Q    Okay.  And so you, ultimately, didn't have to

1    had a conversation with Gary James about it in the

2    distant past.  I don't recall any specific conversation

3    about -- about this case, with anyone.  Except counsel.

4        Q    I'm going to turn your attention to Exhibit, I

5    think, 3, the First Amended Complaint.

6        A    Yes, sir.

7        Q    If you'll turn to Page 17, Paragraph 107.

8        A    Yes, sir.

9        Q    And it says, "DA Prater stated that he

10   believed Rhoades was lying."

11             In that meeting, did you actually say that

12   you -- you believed Mr. Rhoades was lying?

13       A    I don't know if I used that terminology, but

14   that, in fact, was my impression of the information that

15   he was giving me and I -- I told him I didn't think that

16   he was being honest with me and wasn't telling me the

17   truth, that there was something more to this deal.

18       Q    Besides Mr. Harrell, Mr. Rhoades and -- and

19   Ms. Simpson and yourself, was there anyone else in that

20   meeting?

21       A    I believe my first assistant, Jimmy Harmon,

22   was there.

23       Q    Did anyone take notes --

24       A    No.

25       Q    -- during that meeting?